# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black; padding:10px;">

*Pepper Construction Co. v. Palmolive Tower Condominiums, LLC,*
2021 IL App (1st) 200753

</div>

| | |
|---|---|
| Appellate Court Caption | PEPPER CONSTRUCTION COMPANY, Plaintiff and Counterdefendant-Appellant and Cross-Appellee, v. PALMOLIVE TOWER CONDOMINIUMS, LLC; ABN AMRO MORTGAGE CORPORATION, INC.; ALZENSTEIN, NEAL; ALMEIDA, JILL F.; ALMEIDA, RICHARD J.; AMERICAN BROKERS CONDUIT, f/k/a American Home Mortgage Company; ANNING-JOHNSON COMPANY; ANTARES IRON AND COPPER, INC.; ASHER BROTHERS COMPANY, INC., ATG TRUST COMPANY, as Trustee of Trust Agreement No. 10261 Dated 7/25/2006; BALLAS, PETER G., as Trustee of the Peter G. Ballas Revocable Trust Dated 5/23/2003; BANK OF AMERICA; BANK UNITED FSB; BARRETT, MARILYN E.; BARRY, MARCELLA; BARRY, ROBERT; BARRY THOMAS PLUMBING, INC.; BARSANTI WOODWORK CORPORATION; BERGDAHL, LINDA J.; BERGLUND CONSTRUCTION; BERNHARD WOODWORKS, LTD.; BIG BEAVER AND CROOKS, LTD., LLC; BIRKEL, MARTIN P.; BLAZER, JUDITH E. AND HENRY E. FULDNER, as Trustees of the Judith E. Blazer Living Trust Dated 10/21/1996; BOOTH, LAURENCE; BOOTH, PATRICIA; BOURBON TILE AND MARBLE, INC.; BOYSEN, ROWENA; BREAK THRU ENTERPRISES, INC.; BUCKLEY, MORTIMER; BURKARD, JEFFREY; BYNOE, LINDA WALKER; BYNOE, PETER; CABRERA, MARIA; CALKINS, CATHERINE B.; CALKINS III, RUSSELL W.; CAMINO MODULAR SYSTEMS USA, INC.; CAPITOL GLASS; CHARLES SCHWAB BANK; CHICAGO BANCORP INC.; CHICAGO FINANCIAL SERVICES, INC.; CHICAGO TITLE AND TRUST COMPANY; CITIBANK; CITI MORTGAGE, INC.; COLCO SERVICES, INC.; COLE TAYLOR BANK; COLUMN FINANCIAL, INC.; COMBS, MARK E.; CONNAUGHTON, JAMES T.; CONNELLAN, JOHN; COUNTRYWIDE HOME LOAN; CREATIVE INDUSTRIES TERRAZZO; CUSTOM STAINLESS; DAW, JAMES F.; DELANEY, MADELEINE; DELEERS MILLWORK INC.; DELEEUW, DEBRA ANNE SYLVAN; DELEEUW, ROBERT; |

DEMIRJIAN, CHARLES; DIMAURO, ALEXANDER; DOUGLAS IRON WORKS, INC.; DP 159e. WALTON, LLC, R.A.; DRAPER AND KRAMER MORTGAGE; EARHART, BARRIE, as Trustee of the Barrie M. Earhart Revocable Trust Dated 2/24/2003; ELSMAN, CYNTHIA; ELSMAN JR, JAMES L.; ELSMAN III, JAMES L.; ELSMAN, JANICE M.; EZTECH MANUFACTURING, INC.; FEENEY, LOUISE; FIRST FRANKLIN; FIRST MIDWEST BANK; FLOORING RESOURCES CORPORATION; THE GASLIGHT COMPANIES; GEORGES, CHRISTOS; GEORGES, MARIA; GEORGIS, MARY LOU; GERMONT, JOY; GLAROS, WILLIS H.; GLICKMAN, ROSS B.; GLICKMAN, SUZANNE A.; GRAND APPLIANCE AND TV; GRUNBERG, TED; GURTZ ELECTRIC COMPANY; HARRIS NA; HAWKINS, JAMES B.; HAWKINS, MARY PAT; HENKEL, FRANCES C.; HENKEL, MICHAEL C.; HILL MECHANICAL CORPORATION; HOURIHANE, KRISTINA K.; HOURIHANE, PATRICK D.; INTERNATIONAL MARBLE AND GRANITE SUPPLY, INC.; J. KAPCHECK AND COMPANY; JOHN CARETTI AND COMPANY; JOHNSTONE, LISA A.; JOHNSTONE, MICHAEL B.; JONES, HERBERT A.; JONES, KIMBERLY M.; JP MORGAN CHASE BANK; K7K IRON WORKS, INC.; KEHOE, THOMAS G.; LaFORCE HARDWARE AND MANUFACTURING COMPANY/WISCONSIN; LANDIS, GREGORY J., as Trustee of the Gregory J. Landis Declaration of Trust Dated 9/14/1998; LECOQUE, JAY K.; LILIE, HAROLD J.; LOEFFLER, KELLY L.; LOOMIS, BRIAN S.; LYN-DEN, INC.; MAKAM, PADMINI S.; MAKAM, SATYAPRAKASH N.; MANSON, JULIE N.; ARIA MAZER LIVING TRUST, Dated 9/23/2005; RICK MAZER LIVING TRUST Dated 9/23/2005; MAZER CONSTRUCTION COMPANY; McGRATH, KRISTINA; McGRATH, MICHAEL; MENENDEZ, ALICIA S.; MIDWEST WOODWORK AND VENEERING, INC.; MILLER, SUSAN H.; MK INDUSTRIES, INC.; MOORE, HELEN; MOORE, WAYNE; MORTGAGE ELECTRONIC REGISTRATION; MURAD, NADIA; MABS INVESTMENTS, LLC, R.A.; NATIONAL CITY MORTGAGE; NATIONAL ELECTRICAL BENEFIT FUND; NAYER, RAJEEV; NAYER, RITU; NORTHSTAR FIRE PROTECTION; MARLA NYBERG DECLARATION OF TRUST Dated 12/1/1998; OAK BROOK BANK; O'CONNELL, CORMAC; PALMOLIVE BUILDING BASE, LLC; PARK NATIONAL BANK; PAPPAS, NICHOLAS J.; PARENTI AND RAFAELLI LTD.; PEDERSEN, MYRNA E.; PERRY, FRANK S., as Trustee of the Frank S. Perry Trust Dated 1/17/2002; PIMENTEL, GEORGE B.; PIMENTEL, ZANA; POLIFORM; PRINCE, CYNTHIA; PROCHNOW, DOUGLAS L.; RAMPY; RESNICK, NANCY; RESNICK, PHILLIP; ROSEN, BRIAN; ROSS, MARIA; ROSS, RICHARD; ROZRAN, DAWN F.; ROZRAN, JACK L.;

- 2 -

RUBENSTEIN, MARC A.; BETH S. RUBIN REVOCABLE TRUST 3/7/2007; MORRONI SARDO, INES, Trustee of the Ines Morroni Sardo Trust Dated 12/17/2004; SHIMER, ROBERT J.; SHOWERWORKS; SHUTTER, JENNIFER M.; SHUTTER, JON D.; SIMON, MARCY, as Trustee of the Marcy Simon Trust Dated 9/19/1999; SPECH, LARRY; SPRECHER, JEFFREY C.; STEVENSON, CHASE; STEVENSON, JOHN; STEWART, JAY S.; STEWART, JUDITH D.; STRINGFELLOW, JAMES; THE NORTHERN TRUST COMPANY OF ILLINOIS; THE PRIVATE BANK MORTGAGE COMPANY; TIDY INTERNATIONAL; TIRAPELLI, RONALD; TRAVERS, SUZANNE; TRINITY ROOFING SERVICES, INC.; THE VAV2005 TRUST Dated 8/8/2005; VORWALLER, AVA M.; VORWALLER, GREGORY S.; WALLACK, LEWIS; WASHINGTON MUTUAL BANK; WEAVER, AMY J.; WEAVER, RICHARD G.; WELLS FARGO BANK; WEINER, BARBARA A.; WILLMOT, PETER S.; WITTENMYER, ERIC; WOODFIELD PLANNING CORPORATION; NONRECORD CLAIMANTS; and BOURBON MARBLE, INC., Defendants (Bourbon Marble, Inc., Defendant and Counterplaintiff-Appellee and Cross-Appellant).

| | |
|---|---|
| District & No. | First District, Sixth Division <br> No. 1-20-0753 |
| Filed <br> Rehearing denied | September 17, 2021 <br> October 25, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CH-14994; the Hon. Patrick J. Sherlock, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part. <br> Cause remanded. |

| Counsel on Appeal | Gino L. DiVito, John M. Fitzgerald, Jordan E. Wilkow, and Jonathan S. Kim, of Tabet DiVito & Rothstein LLC, of Chicago, and Bruce W. Ficken (*pro hac vice*) and James M. Kwartnik (*pro hac vice*), of Cozen O'Connor, of Philadelphia, Pennsylvania, for appellant. |
| | |
| | Ethan E. Trull, Keith E. Edeus, Seth A. Horvath, and Elizabeth Z. Meraz, of Nixon Peabody LLP, of Chicago, for appellee. |

| Panel | JUSTICE CONNORS delivered the judgment of the court, with opinion.<br>Presiding Justice Mikva and Justice Harris concurred in the judgment. |

## OPINION

¶ 1     This appeal concerns a dispute between a general contractor for a construction project, Pepper Construction Company (Pepper), and one of its subcontractors, Bourbon Marble, Inc. (Bourbon). Beginning in 2004, Pepper, Bourbon, and other subcontractors worked on an interior build-out of approximately 96 condominium units in a building owned by Palmolive Tower Condominiums, LLC (Palmolive), and located at 919 North Michigan Ave in Chicago. The project was rife with problems, and Pepper and Bourbon stopped working on the project in March 2007. Pepper and the subcontractors participated in arbitration proceedings against Palmolive. Eventually, Pepper settled with Palmolive, and only issues between Pepper and Bourbon remained. In the circuit court proceedings leading to this appeal, Bourbon pursued breach of contract and unjust enrichment claims against Pepper. After a bench trial, the trial court entered judgment for Bourbon on both claims. Bourbon was awarded $271,687.87 for the breach of contract claim, $400,131.92 for the unjust enrichment claim, and $3,657,984.08 in attorney fees and costs. Pepper appealed, and Bourbon cross-appealed. We affirm in part, reverse in part, and remand for further proceedings.

¶ 2                                  I. BACKGROUND

¶ 3     The parties' arguments on appeal span the long history of this case. We recounted some of the following facts in a previous opinion, *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2016 IL App (1st) 142754 (*Pepper I*), and provide additional background below.

¶ 4            A. Joint Interest and Liquidating Agreement and Arbitration Proceedings

¶ 5     Before the arbitration proceedings, Pepper, Bourbon, and other subcontractors entered into a joint interest and liquidating agreement (JILA), which sought to provide a coordinated and joint strategy against Palmolive. According to the JILA, Pepper's and the subcontractors' damages were overwhelmingly caused by Palmolive. Pepper and the subcontractors agreed "that the most efficient and cost effective method of recovering amounts due from [Palmolive] is to present all Subcontractors' claims as part of [Pepper's] claims in the Arbitration." Pepper

would include the subcontractors' claims in Pepper's presentation against Palmolive, and the subcontractors accepted "full responsibility for the presentation of evidence in support of their claims." Each subcontractor agreed to

> "accept as their sole and exclusive compensation for its Subcontractor Claim as part of the Arbitration Proceeding, the amount negotiated by it in settlement or as determined by the Arbitrators to be due and owing each Subcontractor from [Palmolive], [Pepper], and/or each other with the exception of any backcharges or other open issues between and among [Pepper] and the Subcontractors."

Pepper would not settle all or any part of its claims against Palmolive that related to or impacted any subcontractors' claims without the participation of and express advance written authorization from the affected subcontractor.

¶ 6    The JILA included provisions about sharing information, but those arrangements were not to be construed "to affect each Party's separate and independent representation by counsel." Pepper and the subcontractors were "free to engage independent outside counsel and/or consultants for any purpose." However, that engagement was solely at the expense of the party retaining the counsel or consultants.

¶ 7    Each subcontractor retained responsibility, including financial responsibility, for proving its entitlement and quantification of its claim and the accuracy of its portion of Pepper's claim submitted in the arbitration. As general contractor, Pepper had "overall responsibility for all matters asserted" in the arbitration and retained "final decision making authority over the procedural aspects and presentation of all matters submitted" in the arbitration. Still, each subcontractor would "present its own claim in the Arbitration and assume all financial responsibility for doing so."

¶ 8    The JILA provided as follows for how an arbitration award would be distributed:

> "With respect to any amount recovered from [Palmolive] or from any of the Parties hereto by an award in the Arbitration (the "Reasoned Award"), [Pepper] agrees that such amounts will be distributed as provided in the Reasoned Award issued by the Arbitrators. The Parties agree that such a Reasoned Award will act as *res judicata* as to each Party's claim against [Palmolive] and to any specific findings and awards between [Pepper] and any individual Subcontractor and between or among the Subcontractors. *** As used herein, the term Reasoned Award shall mean an award that has been reduced to writing and which expressly identifies each Subcontractor by name, [Pepper], and [Palmolive] and sets forth explicitedly [*sic*] the amounts to be awarded each respectively pursuant to their claims and which sets forth the factual and legal basis for such award. [Pepper] assumes responsibility for obtaining the written consent of the Arbitrators to issue a Reasoned Award."

If one of the parties was determined to be a prevailing party by the arbitrators, Pepper would submit and prosecute the prevailing party's claims and attorney fees and costs or allow the subcontractor to do so in Pepper's name at its own expense.

¶ 9    How the arbitration actually occurred has prompted the parties to dispute whether the JILA's vision was indeed realized. In February 2008, the arbitrators issued an order that allowed a representative for each subcontractor and/or its attorney to attend depositions but not ask questions. The order also stated that, at the hearing, only attorneys of record for Pepper and Palmolive would be allowed to ask questions and present evidence. Pepper could expand

its attorneys of record as it saw fit, but generally, only one attorney would be allowed to examine or cross-examine a witness.

¶ 10    Arbitration hearings took place over 90 days between October 28, 2008, and December 17, 2009. At one point during the proceedings, Pepper's counsel stated that Bourbon's counsel was "counsel for Bourbon Tile and Marble" and "representing Pepper Construction Company for the limited purposes of presenting Bourbon's claim under the joint interest and liquidating agreement." Bourbon's counsel examined two witnesses at the hearing, including an expert retained by Bourbon to quantify its losses. Bourbon's counsel also cross-examined Palmolive's expert. Pepper's closing arbitration brief proposed that the award for Bourbon's pass-through claim was $3,185,234.

¶ 11    In an interim award, the arbitrators found that the JILA complied with applicable requirements. The elements of Pepper's claims relating to the subcontractors were pass-through claims. The arbitrators stated that under *Paschen Contractors, Inc. v. City of Kankakee*, 353 Ill. App. 3d 628 (2004), a general contractor may sustain a cause of action in its name for work done under a contract when it solicits a subcontractor to actually perform the work. Further, the February 2008 order "clearly establishes that the subcontractors are not separate parties to the arbitration, and that their legal counsel, to the extent of their participation in the hearings, are simply serving as co-counsel to Pepper for the limited purpose of assisting Pepper with the presentation of the [subcontractors'] pass through claims."

¶ 12    Ultimately, the arbitrators found that Palmolive materially breached its contract with Pepper and caused damages to Pepper. The arbitrators "[awarded] Pepper damages" as summarized in the following table:

| Item | Award |
|---|---|
| Pepper Construction Company's Damages (as General Contractor and for Self-Performed Work) | $13,667,499 |
| Drywall (Anning Johnson's Cost of the Work) | $488,049 |
| Painting (Ascher Brothers' Cost of the Work) | $515,022 |
| Stone & Tile (Bourbon Tile & Marble's Cost of the Work) | $780,649 |
| Mechanical (Hill Mechanical's Cost of the Work) | $823,616 |
| Wood Flooring (Lyn-Den's Cost of the Work) | $2,722,319 |
| Woodworking (Midwest Woodwork & Veneering's Cost of the Work) | $665,299 |
| Total Award to Pepper (Before Interest) | $19,662,453 |
| Interest at Statutory Rate of 5% per annum from December 1, 2006, to February 1, 2010 | $3,119,058 |
| Total Award to Pepper Including Interest | $22,781,511 |

Interest was calculated on the total amount awarded to Pepper without calculating the allocation among Pepper and the subcontractors. Another table detailed damages for "Stone & Tile (Bourbon Tile & Marble's Cost of the Work):"

| Contract Balance | $193,843 |
|---|---|
| Pending Changes | $601,589 |
| Changed Conditions (Productivity Loss) | 0 |

| Other Additional Costs (Financing) | 0 |
|---|---|
| Less: Adjustment | ($14,783) |
| Total Award to Pepper for Stone & Tile (Bourbon Tile & Marble) | $780,649 |

The arbitrators also awarded $434,864 in damages to Palmolive.

¶ 13    The arbitrators determined that Pepper was the prevailing party. After Pepper filed a motion to award attorney fees and costs, the arbitrators determined that the attorney fees and costs associated with the presentation of the pass-through subcontractors' claims were allowed to the extent that the fees and costs were "incurred as co-counsel for Pepper in the Arbitration." The arbitrators agreed with the following statement from Bourbon's counsel at the time:

> "[Bourbon] is not now and never has been a party in the arbitration. It has no claims pending before the arbitrators for their adjudication. Counsel for Bourbon only appeared in the hearing and participated in the arbitration in the capacity of assisting Pepper Construction Company with the presentation of a *portion* of Pepper Construction Company's claims which related to Bourbon's work at the premises of the Palmolive Building. For example, Bourbon's counsel only appeared as a 'special counsel for Pepper' and never as counsel for Bourbon, itself. As one might expect, had Bourbon appeared as a party in the arbitration, the presentation of proof on its behalf would have been significantly different than what was presented on behalf of Pepper Construction. Moreover, Bourbon has other claims relating to the Project that were not presented in the arbitration and is also facing claims related to the Project that were not presented in the arbitration." (Emphasis in original.)

The total attorney fees and costs "awarded to Pepper" was $10,905,935.18, of which $307,751.36 were the attorney fees and costs related to "Stone & Tile (Bourbon Marble, Inc./Bourbon Tile & Marble, Inc.)." Including attorney fees and costs, Pepper was awarded a total of $33,843,668.17.

¶ 14    On October 1, 2010, the circuit court entered an order confirming the award and entering a final judgment in favor of Pepper in the amount of $35,234,786.59, and in favor of Palmolive in the amount of $450,372.08, which included accrued interest. Palmolive appealed, but the appeal was dismissed after Pepper, Palmolive, and several entities—but not Bourbon—entered into a global settlement agreement in March 2012. Pepper and Palmolive settled all of their claims against each other, and Pepper was paid approximately $21 million. Also in March 2012, Pepper and Bourbon entered into an agreement and partial release, in which Bourbon released claims against all parties except Pepper and Pepper paid Bourbon $850,000. The agreement noted that Pepper and Bourbon disputed the amount Bourbon may be owed and that the $850,000 payment was not an admission on the merits of the dispute or a cap on the amount that Bourbon could pursue for the remaining disputes. If Bourbon prevailed on its claims for additional payment, Pepper would be entitled to a credit for $850,000 to avoid the possibility of a double recovery.

¶ 15                    B. Circuit Court Proceedings and the First Bench Trial

¶ 16    As the circuit court proceedings continued, Bourbon pursued a breach of contract claim against Pepper, and Pepper filed a counterclaim. Pepper also raised affirmative defenses, including that the JILA barred or limited Bourbon's claims. In response, Bourbon asserted in part that the intent of the JILA was materially frustrated or abandoned. According to Bourbon,

the arbitrators' scheduling and discovery order "destroyed any pretense that the Subcontractors could exercise any meaningful control over the development, presentation, and defense of any of their claims." In a written order dated January 22, 2013, the circuit court found that there was a genuine issue of material fact as to whether Bourbon was bound by the JILA and barred or limited by its terms, and whether Bourbon's claims were barred or limited by the JILA.

¶ 17 Pepper also raised an affirmative defense based on failure of a condition precedent. Pepper relied on section 8 of the subcontract, which stated in part that "it is an express condition of the Subcontract Agreement that PEPPER's obligation to pay Subcontractor is contingent upon receipt of payment from Owner[1] for Subcontractor's work." Pepper also relied on section 44(I)(4), which stated in part, "Owner's payment to Pepper is a condition precedent to Pepper's obligation to pay Subcontractor unless the Owner's refusal to pay is due to a material breach by Pepper of its Agreement with the Owner." Pepper asserted that it was not required to pay Bourbon until it was paid by Palmolive but that Pepper paid when it was paid.

¶ 18 In a written order, the circuit court found that the subcontract's pay-when-paid clause was not invalid on its face and there was no basis to find that the clause had been rendered invalid by some action by Pepper. Further, Pepper could not assert the clause as an affirmative defense because Pepper had been paid by Palmolive for all work performed on the project. There were no allegations that outstanding amounts were due under the general contract.

¶ 19 In another order, the circuit court found that Bourbon was judicially estopped from asserting that Pepper was liable for the same damages that Bourbon presented at arbitration as having been caused by Palmolive.

¶ 20 A bench trial was held on Pepper's claims, and Pepper was awarded $36,312 in damages. The circuit court declined to consider the effect of the JILA and did not rule on issues related to Bourbon's obligations under the JILA.

¶ 21                          C. Previous Appeal

¶ 22 On appeal to this court, Bourbon asserted in part that judicial estoppel was improperly applied to it. *Pepper I*, 2016 IL App (1st) 142754, ¶ 61. Bourbon also stated that judicial estoppel should have been applied to Pepper because Pepper made factual claims at arbitration that established that Pepper was liable for Bourbon's work but, in the circuit court, Pepper contested Bourbon's entitlement to the same amounts that Pepper had sought for itself at arbitration. *Id.* We found that judicial estoppel should not apply to either party because each sought to bar the other from contesting liability, which is a legal conclusion. *Id.* ¶ 67. Also, it was unclear exactly what the parties' positions were on liability at arbitration. *Id.* ¶ 68. The parties failed to show that their positions were totally inconsistent. *Id.* We noted that Pepper "[appeared] to have gone to some effort at arbitration to ensure it did not take a position on Bourbon's damages." *Id.* ¶ 69.

¶ 23 Pepper asserted on appeal that the JILA barred Bourbon's claims. *Id.* ¶ 80. We declined to address whether the JILA was valid and enforceable against Bourbon because the circuit court did not rule on the issue. *Id.* ¶ 81. The cause was remanded for further proceedings.

---

[1]The subcontract states that the owner is Palmolive. We use both owner and Palmolive to refer to the same entity.

¶ 25      In September and October 2016, Pepper filed motions related to the JILA, stating in part that the JILA limited Bourbon's claim to the amounts awarded to Pepper on account of Bourbon's pass-through claim at arbitration. Bourbon's position was that the JILA did not apply because the arbitrators did not determine the amount due Bourbon from Pepper or anyone else, which was a condition precedent to Bourbon's obligation to accept that amount in release of its claims against Pepper.

¶ 26      On November 10, 2016, the circuit court entered a written order stating that the JILA was not relevant to the remaining issues. The court noted that the arbitrators did not allow the subcontractors to present their claims and the arbitration did not determine the obligations or disputes under the subcontract between Pepper and Bourbon. The court recalled that the JILA stated that the arbitrators would issue a "Reasoned Award" that would expressly identify each subcontractor by name, as well as Pepper and Palmolive, and "set forth explictedly [*sic*] the amounts to be awarded each respectively pursuant to their claims and *** the factual and legal basis for such award." However, the plain language of the award clearly stated that the award was to Pepper and the Reasoned Award did not set forth a factual or legal basis for an award to any subcontractor, though it did state the factual and legal basis for the award to Pepper. The court concluded that, because there was no award in the arbitration to Bourbon, there was no need to determine whether the JILA was binding and enforceable against Bourbon.

¶ 27      On April 19, 2017, Bourbon filed a third amended counterclaim against Pepper, which asserted claims for breach of contract and unjust enrichment and stated in part as follows. In November 2004, Palmolive entered into a general contract with Pepper to convert the subject building to condominiums, and in September 2005, Pepper entered into a subcontract with Bourbon to furnish stone work for $6.15 million. As a result of various failures by Pepper, Bourbon's work was delayed, and it incurred additional costs. In March 2007, Pepper terminated its contract with Palmolive and ordered Bourbon off the jobsite before Bourbon could complete its work. As part of Pepper's subsequent arbitration against Palmolive, Bourbon retained a law firm to act as cocounsel to Pepper and an expert to help Pepper present its pass-through claims. The arbitrators' award to Pepper included fees and costs for the law firm and expert, but Pepper refused to reimburse Bourbon. Pepper also refused to pay Bourbon the full amount of its claim and demanded that Bourbon accept a substantial reduction of the amounts due. In March 2012, Pepper paid Bourbon $850,000, not in satisfaction of Bourbon's claim but solely in exchange for Bourbon's release of certain mechanic's liens and the dismissal of claims against other parties. The $850,000 payment was a credit against any future judgment that Bourbon might obtain against Pepper.

¶ 28      Bourbon asserted that Pepper had breached the subcontract by refusing to pay sums due and sought $2,437,475 in damages, plus prejudgment interest and attorney fees. Bourbon sought $307,751.36 for its unjust enrichment claim, plus prejudgment interest, stating that its retention of a law firm and expert at arbitration provided a benefit to Pepper to Bourbon's detriment.

¶ 29      Pepper responded to the counterclaim, stating in part that Palmolive's acts and omissions prevented Pepper and the subcontractors from timely completing the project. Pepper further asserted that the parties agreed that Bourbon's recovery would be limited by the arbitration award. Pepper stated that it had already paid Bourbon more than what was awarded for

Bourbon's arbitration claim because it paid Bourbon $250,000 in August 2007 as a prearbitration advance and $850,000 in March 2012 as a partial settlement.

¶ 30    On July 3, 2017, Bourbon filed a motion for partial summary judgment on its unjust enrichment claim. Bourbon stated that, because the circuit court found that the JILA was irrelevant, the JILA did not govern the parties' rights with respect to attorney fees and costs and that Bourbon's remedy was in quasi-contract. Bourbon also contended that the JILA was unenforceable. According to Bourbon, a condition precedent was not met because the arbitrators refused to hear Bourbon's claim along with Pepper's claim. Further, the purpose of the JILA was frustrated when the arbitrators determined that Bourbon would not be a party and would not be allowed to present its claim. Meanwhile, Pepper stated there was no finding that the JILA was a nullity. Pepper asserted that unjust enrichment was not available because an express contract addressed the substance of the alleged implied contract. The circuit court ultimately denied Bourbon's motion for partial summary judgment on its unjust enrichment claim.

¶ 31    On February 9, 2018, Bourbon filed another motion for partial summary judgment, asserting that Pepper was bound to certain statements by the doctrines of judicial admissions and judicial estoppel. The purported judicial admission derived from Pepper's fourth amended mechanic's lien (referred to as the FAML), which was recorded on July 24, 2007, and reflected a total amount due Pepper of $34,033,67.44, of which $2,813,755.40 was attributable to Bourbon's work. The FAML was supported by an affidavit from Pepper's general counsel. Bourbon stated that Pepper conclusively admitted the truth of the facts asserted in the FAML by attaching and incorporating the FAML in a complaint to foreclose the lien. As for judicial estoppel, Bourbon contended that, at arbitration, Pepper submitted proofs asserting that Bourbon had performed work worth essentially $2,813,755.40, plus interest that had accrued to that date, for a total of $3,185,234.

¶ 32    In response, Pepper stated that its only admission was that the FAML included claim amounts provided to Pepper by its subcontractors. Also, the amount of a lien stated in the FAML had nothing to do with the lien's validity or enforceability, and so it was not a judicial admission. Turning to judicial estoppel, Pepper stated that it was the law of the case that Pepper did not take a position on Bourbon's damages at arbitration.

¶ 33    After a hearing, the circuit court denied Bourbon's motion for partial summary judgment. In its oral ruling, the circuit court stated in part that the affidavit attached to the FAML did not reflect personal knowledge uniquely attributable to the affiant that the amount was accurate, so the amount in the lien was not a judicial admission. The circuit court also found that judicial estoppel did not apply, stating that, at the arbitration, Bourbon was responsible for presenting its damages and Pepper's expert did not vouch for those damages.

¶ 34    In a brief filed before trial, Bourbon stated that its damages were calculated using a total cost method, which was warranted because Pepper effectively terminated its subcontract and the circumstances made it impossible to determine what effect any single change in the project had on Bourbon's productivity. Bourbon further stated that its economic damages were $2,688,612, before interest and attorney fees.

¶ 36        Bourbon's witnesses at trial included Larry Bourbon, who founded the company with his wife.[2] Larry testified about Bourbon's process for putting together a project bid and stated that the final contract price was $6,150,000. Larry recalled that the original schedule was a flying wedge, where work would start in the middle of the building and proceed to higher and lower floors. However, the project became chaotic, in part because unit purchasers made selection changes that required different materials. Pepper had a superintendent on every floor, "and they would come to us all independently, wanting guys relocated and moved around," which was inefficient. Pepper later assigned one superintendent to Bourbon, but the chaos continued. Larry also testified about payments that Bourbon received. Around the time the JILA was signed, Pepper advanced $250,000 to Bourbon for past-due invoices. In 2012, Pepper paid Bourbon $850,000 for Bourbon's lien. That latter payment would have to be accounted for if Bourbon received a favorable judgment.

¶ 37        Bourbon's counsel read into the record portions of previous testimony from prior proceedings. We summarize that testimony below.

¶ 38        Kenneth Egidi, Pepper's president, testified at arbitration that the owner's representative "totally ignored" the flying wedge and sequence of construction. Pepper received documents out of sequence and not in accordance with the previously agreed-upon document schedule. Further, the owner's representative gave Pepper directions that were driven by the unit purchasers. Pepper was pulled in several different directions all of the time. Among the exhibits at trial were two letters related to the end of Pepper's involvement, both dated in March 2007. The first letter was sent from Pepper to Palmolive and stated that Pepper was terminating its performance. The letter alleged that Palmolive breached the general contract by consistently failing to provide design documents that were complete, coordinated, and constructible, failing to negotiate change order requests in good faith and in a timely manner, failing to pay Pepper as required, and delaying Pepper's progress on the job. The second letter was sent from Egidi to the subcontractors, titled "Notice of Termination of Work," and stated in part:

> "You are hereby given Notice that on Monday, March 19, 2007, Pepper *** informed Palmolive *** that [Palmolive] was in material breach of its agreement with Pepper. *** All Work under your Subcontract will end on Sunday, March 25, 2007. You should be prepared to demobilize and remove all materials and equipment from the project by the end of the work day on Friday, March 23, 2007. You are not authorized by Pepper to perform any further work at the Palmolive Tower Project under the terms of your Subcontract. This is not a termination of your Subcontract with Pepper."

¶ 39        Brian Peter, a project executive with Pepper, testified at arbitration and the first trial as follows. The initial plan for change orders was that Pepper and the subcontractors would price changes, those prices would be approved by Palmolive, and then work would proceed. That plan was not executed because documents were not issued in a logical sequence. Further, the volume of design information and changes were more than what could have been imagined, and a large backlog quickly developed. Design information was received randomly from many sources. Bourbon was unable to maintain a flow of work and had to provide more workers in a random pattern on more floors than anticipated. Bourbon's progress was also affected by

---

[2]We refer to Larry Bourbon by his first name to avoid confusion with the party name.

selections from unit purchasers, who would for instance request a thicker stone than originally planned.

¶ 40　　Jay Jacobsmeyer, who also worked for Pepper, testified at the arbitration hearing about the chaotic nature of the project. Although the original plan was to work floor-by-floor, "[s]cheduling turned into unit by unit and then it turned into room by room and then it turned into issue by issue across 96 units on the project." Information about changes was received through a variety of sources, leading to "thousands of pieces of paper" that had to be priced. It became nearly impossible for Pepper and the subcontractors to process change orders. Jacobsmeyer also described how he motivated the subcontractors, admitting that he demanded more from them than they were contractually obligated to do. Jacobsmeyer stated that Pepper should have held the work sooner, pushed back on the owner, and suggested "[stopping] the train, [finishing] the design," and proceeding efficiently.

¶ 41　　Nicholas Hawkins, a Pepper project manager, testified at arbitration that Pepper did not let the subcontractors make excuses. According to Hawkins, "We pushed these guys *** as much as we could to get the job done, to stop the bleeding, to reduce the amount of opportunities to make changes by getting units done."

¶ 42　　Richard Sieracki, who was Pepper's retained expert at arbitration, testified at that proceeding that the project's delays were caused by "late design, piecemeal design, and the scope growth." Sieracki testified about his role in preparing for the arbitration. He met with each of the subcontractors to understand how they were going to quantify their damages, what their methodology was going to be, and if their methodology was consistent with what Sieracki had seen used in the industry. Sieracki spoke with Bourbon's expert to make sure he followed the industry-accepted format, "but it is his qualification." Sieracki performed "some review" of Bourbon's claim "to understand the basis of it, understand the issues, understand at least to some degree the quantification approach." Bourbon's expert made adjustments after Sieracki told him that certain aspects of the claim did not make sense. Sieracki agreed that his role was to perform quality control.

¶ 43　　Bourbon also called live witnesses to testify at trial. Robert Lessman, Pepper's former vice president and general counsel, testified about the mechanic's liens that were filed related to the project. Bourbon's claim was included in Pepper's liens. Lessman stated that "the computation of damages by the subcontractors was uniquely and specifically controlled by the subcontractors." Each subcontractor either had its own expert or had been in the process of retaining one. Pepper's expert was only able to make "a very cursory review" of the subcontractors' claims, and Pepper did not have the access needed to audit or do an accounting of the subcontractors' books. Pepper relied on the subcontractors' credibility and encouraged them to provide the best numbers possible "as the foundation for [Lessman's] ability to say these are credible, legitimate, accurate numbers."

¶ 44　　Patrick Andrew McGeehin, a senior managing director with FTI consulting, testified as an expert witness in construction accounting and the calculation of damages. According to McGeehin, Bourbon's damages on a total cost basis were $2,688,612 before interest and $4,252,058 after including interest since March 2007. Because the contract between Pepper and Bourbon was terminated, the proper measure of damages was to put Bourbon in a position to be made whole, which meant that Bourbon recovered all of its costs and a reasonable profit, less what Bourbon had been paid.

¶ 45     As part of its defense, Pepper called as a witness Brian Peter, the Pepper project executive. Explaining why Pepper stopped working in March 2007, Peter stated that Palmolive changed its philosophy about change requests and Pepper felt it needed to protect itself and the subcontractors from losing opportunities to be paid for delays and impacts. Peter also explained the last sentence of the "Notice of Termination of Work" letter, which stated that the subcontracts were not terminated. Peter stated that this sentence was included so that the subcontractors could resume work if Pepper and Palmolive resolved their differences or if the subcontractors' work became the subject of a warranty claim. Peter further testified about payments that Pepper made to subcontractors. Pepper paid $250,000 to each of the subcontractors involved in the JILA to help offset the burdens and costs of the upcoming arbitration. Pepper knew the process would be long and wanted to show good faith. Pepper also paid Bourbon $850,000 in the context of Pepper's settlement with Palmolive, which required that all mechanic's liens be released. Other subcontractors—but not Bourbon, who was not a party to the settlement—accepted two-thirds of what had been requested at arbitration and signed off their lien waivers. To obtain a lien waiver from Bourbon, Pepper negotiated an agreement and partial release and paid Bourbon $850,000, which allowed Pepper to conclude the settlement.

¶ 46     Louis Davia testified that he worked for Bourbon until 2008 and had been the employee most familiar with the Palmolive work. According to Davia, the owner was to blame for the project's problems. Davia agreed that Palmolive was late on its drawings, provided unforeseen customization, and created problems with the schedule.

¶ 47     Alan Nagorzanski, who was Palmolive's expert at arbitration, testified that Bourbon had been overpaid by $309,535. Nagorzanski criticized several aspects of Bourbon's total cost claim, including that Bourbon had not met any of the required elements for a total cost approach to damages. On cross-examination by Bourbon's counsel, Nagorzanski noted the failures on Pepper's part that he had previously identified. According to Nagorzanski, Pepper did not timely and properly process changes and in some instances did not timely submit pricing information from subcontractors to the owner. Nagorzanski opined that Pepper's delay in responding to potential changes disrupted the flow of funds to the subcontractors and adversely impacted the subcontractors' staffing. Nagorzanski also critiqued aspects of Pepper's initial project schedule and stated that Pepper did not provide subcontractors with updated schedules.

¶ 48     Sam Hadley testified for Pepper as an expert in accountancy for construction projects and other related matters. Hadley was engaged to review and provide opinions on the report from Bourbon's expert, Patrick McGeehin. Hadley stated in part that, when making his calculations, McGeehin did not adhere to the terms and conditions that the parties agreed to. Bourbon's claimed costs exceeded the parties' agreement.

¶ 49     After the parties submitted closing briefs, the trial court issued a written ruling on July 31, 2019, that entered judgment for Bourbon on its breach of contract and unjust enrichment claims. In part, the court found controlling section 20 of the subcontract, which is titled "Contract Termination" and states in part:

    "It is agreed that, should the Owner/PEPPER Contract for the Project for which this Subcontract Agreement is written, be terminated or the progress of the Work delayed due to conditions which PEPPER cannot control, PEPPER may terminate this Subcontract Agreement without any liability to the Subcontractor and the

Subcontractor will be entitled to payment for materials and/or labor approved and accepted by PEPPER and by Owner * * * and actually paid to PEPPER by Owner."

The court stated there was no question that Pepper terminated Bourbon's work on the job. The court also found that Pepper had been paid in full by Palmolive as a result of its settlement. The court further found that under section 20 Bourbon was entitled to payment for materials and labor, but not profit and overhead. The court noted that, as part of his analysis, Bourbon's expert computed the amount of materials and labor that Bourbon incurred that was approved by Pepper. Uncontroverted testimony from Bourbon established that the materials and labor costs utilized by Bourbon's expert reflected Bourbon's actual costs on the job.

¶ 50 The court awarded damages on the breach of contract claim as follows:

| | | |
|---|---|---|
| Total Costs | | $6,418,493.00 |
| Payments | | $(5,369,697.00) |
| Settlement | Paid March 2012 | $ (850,000.00) |
| Subtotal | | $ 198,796.00 |
| Interest at 5% | | |
| | March 25, 2007 – March 2012 | $257,829.01 |
| | March 2012 – present | $ 72,891.87 |
| Damages | | $529,516.88 |

As for unjust enrichment, the court stated that Pepper made a claim for and was awarded the amount that Bourbon was now seeking. Further, Pepper settled with the owner in full satisfaction of its claims, including the claim for fees and expert costs actually borne by Bourbon. Pepper enjoyed the benefit of an attorney and expert at Bourbon's cost and accepted this benefit with the understanding that Bourbon expected to be reimbursed. The court awarded damages of $307,751.66.

¶ 51 Overall, the total judgment in favor of Bourbon and against Pepper was in the sum of $837,268.54.

¶ 52 On its own motion, the circuit court later entered an amended order, noting that the earlier judgment order included interest from the last day of work in 2007. The court stated that interest should have been calculated from the date of settlement with Palmolive because payment to Bourbon was not due until Pepper was paid. The court corrected the error and listed the amended damages award as follows:

| | | |
|---|---|---|
| Total Costs | | $6,418,493.00 |
| Payments | | $(5,369,697.00) |
| Settlement | Paid March 2012 | $ (850,000.00) |
| Subtotal | | $ 198,796.00 |
| Interest at 5% | | |
| | March 2012 present | $ 72,891.87 |
| Damages | | $ 271,687.87 |

The unjust enrichment award was not changed.

¶ 53                    F. Posttrial Motions and Attorney Fees

¶ 54     Bourbon filed a motion to reconsider, asserting that the trial court should have (1) awarded prejudgment interest on the unjust enrichment claim and (2) calculated prejudgment interest on the breach of contract claim starting in March 2007. Also, Bourbon and Pepper each filed motions stating that they were the prevailing party and entitled to attorney fees.

¶ 55     On December 30, 2019, the circuit court entered a written order that granted in part and denied in part Bourbon's motion to reconsider. The court awarded prejudgment interest for the unjust enrichment claim, stating that it had the discretion to do so on equitable claims. The court noted that in March 2012 Pepper received its settlement with Palmolive and had full use and enjoyment of the money since that time. Meanwhile, Bourbon advanced the money in good faith and had not been paid all of the money back. The court awarded prejudgment interest for the period Pepper actually had the money, modifying the award to $400,131.92. The court denied Bourbon's request for additional prejudgment interest on the breach of contract claim. The court noted that it awarded prejudgment interest from March 2012 because, under the subcontract, interest should be calculated from the date of the settlement with Palmolive until Pepper was paid. The court further noted that, in seeking additional interest, Bourbon had asserted that the circuit court struck Pepper's affirmative defense based on the subcontract's pay-when-paid clause. The court stated that this ruling did not eliminate the pay-when-paid contractual term. Only after Pepper was paid was it required to pay Bourbon. When Pepper breached that obligation, Bourbon's claim began to accrue interest. Additional prejudgment interest since March 2007 was not available.

¶ 56     On January 2, 2020, the court entered a written order finding that Bourbon was the prevailing party. The court stated that Pepper was not successful on any significant issue and was only awarded approximately $36,000 at the first trial. Meanwhile, in *Pepper I*, Bourbon successfully reinstated its claims against Pepper and limited the trial court's verdict. Further, Bourbon succeeded on its most recent breach of contract and unjust enrichment claims, and both of these awards were significant victories in their own right.

¶ 57     Pepper filed a motion to reconsider the judgment, contending in part that the court improperly applied section 20 of the subcontract. Pepper did not challenge the factual finding that the subcontract was terminated or the court's legal determination that, after such a termination, section 20 of the subcontract controls the amount, if any, due to Bourbon. Instead, Pepper asserted that the trial court failed to consider that section 20 limits Bourbon's award to amounts actually paid to Pepper by the owner. Pepper stated that it already paid Bourbon more than it received from the owner and more than the total amount payable under section 20. Pepper also asserted that the award for unjust enrichment was improper because express contracts governed the parties' relationship.

¶ 58     On April 23, 2020, the court denied Pepper's motion to reconsider, stating that it had reviewed the parties' positions and Pepper had not persuaded the court that the prior ruling should be modified.

¶ 59     On May 12, 2020, the court issued a written order that awarded Bourbon $3,657,984.08 in attorney fees and costs. The award reflected a denial of $358,598.96 in attorney fees related to the total cost claim because Bourbon had no contractual basis for that claim.

¶ 60     Pepper subsequently appealed, and Bourbon cross-appealed.

II. ANALYSIS

A. Pepper's Appeal

¶ 63 On appeal, Pepper contends that (1) Pepper paid Bourbon all amounts due under section 20 of the subcontract, (2) the JILA barred Bourbon's claims against Pepper, (3) Bourbon could not recover under an unjust enrichment theory, and (4) Bourbon was not the prevailing party. We will address each argument in turn.

¶ 64 1. Section 20 of the Subcontract

¶ 65 Pepper asserts that under section 20 of the subcontract, which controls this dispute, it paid Bourbon more than was due and Bourbon could not recover any additional money. As noted, section 20 of the subcontract, titled "Contract Termination," states in part:

"It is agreed that, should the Owner/PEPPER Contract for the Project for which this Subcontract Agreement is written, be terminated or the progress of the Work delayed due to conditions which PEPPER cannot control, PEPPER may terminate this Subcontract Agreement without any liability to the Subcontractor and the Subcontractor will be entitled to payment for materials and/or labor approved and accepted by PEPPER and by Owner *** and actually paid to PEPPER by Owner."

¶ 66 Pepper argues that section 20 limits Bourbon's recovery to the money actually paid to Pepper by Palmolive for materials and labor. Pepper states that the arbitrators attributed approximately $1.088 million of the award to Bourbon. Pepper paid Bourbon $1.1 million, even though Palmolive actually paid Pepper only 66% of the arbitrators' award in the settlement. Pepper argues that it fully satisfied its obligation under section 20 and no further recovery was available.

¶ 67 Before we determine whether Pepper fulfilled its obligation under section 20, we must first address Bourbon's position that section 20 does not even apply. Bourbon seeks to avoid section 20 because it limits its recovery to materials and labor. As discussed later in Bourbon's cross-appeal, Bourbon sought total cost damages at trial, which includes reasonable profit and overhead. We find that Bourbon's recovery is controlled by section 20 and reject Bourbon's arguments to the contrary.

¶ 68 Initially, Bourbon asserts that the law of the case doctrine bars Pepper's reliance on section 20 of the subcontract. Bourbon states that in a January 2013 order the circuit court rejected the pay-if-paid principle memorialized in section 20.

¶ 69 The law of the case doctrine bars relitigation of an issue previously decided in the same case. *Kreutzer v. Illinois Commerce Comm'n*, 2012 IL App (2d) 110619, ¶ 37. Where an issue has been litigated or decided, a court's unreversed decision on that question of law or fact settles that question for all subsequent stages of the suit. *Miller v. Lockport Realty Group, Inc.*, 377 Ill. App. 3d 369, 374 (2007). The law of the case doctrine does not apply where different issues are involved. *Scheffel & Co. v. Fessler*, 356 Ill. App. 3d 308, 312 (2005).

¶ 70 The law of the case doctrine does not apply to Pepper's argument about section 20. In January 2013, the circuit court rejected Pepper's reliance on sections 8 and 44(I)(4) of the subcontract as an affirmative defense. In its order, the circuit court found that Pepper could no longer assert the subcontract's pay-when-paid clause[3] as an affirmative defense because

---

[3]Below, we will clarify the difference between pay-when-paid and pay-if-paid clauses.

Pepper had been paid by Palmolive for all work performed. Pepper's current argument concerns an entirely different section of the subcontract—section 20—which relates to contract termination. The circuit court did not consider section 20, and neither did this court in *Pepper I*. See *Miller*, 377 Ill. App. 3d at 375 (law of the case doctrine did not apply where a reviewing court did not consider the issue). With a different issue presented and no appellate decision on the matter, the doctrine does not prevent Pepper from asserting that section 20 bars Bourbon's recovery.

¶ 71　　The remaining arguments about whether section 20 applies require us to construe section 20, which presents a question of law that we review *de novo*. *Storino, Ramello & Durkin v. Rackow*, 2015 IL App (1st) 142961, ¶ 18. The primary objective in construing a contract is to determine and give effect to the parties' intent at the time they entered into the agreement. *Urban Sites of Chicago, LLC v. Crown Castle USA*, 2012 IL App (1st) 111880, ¶ 24. Further, the language of a contract must be given its plain and ordinary meaning. *Premier Title Co. v. Donahue*, 328 Ill. App. 3d 161, 164 (2002). We consider the contract as a whole rather than focusing on isolated portions. *Associates Asset Management, LLC v. Cruz*, 2019 IL App (1st) 182678, ¶ 20.

¶ 72　　By way of background, Illinois courts have distinguished between pay-if-paid and pay-when-paid clauses. A pay-if-paid clause " 'provides that a subcontractor will be paid *only if* the contractor is paid and thus ensures that each contracting party bears the risk of loss only for its own work.' " (Emphasis in original.) *Beal Bank Nevada v. Northshore Center THC, LLC*, 2016 IL App (1st) 151697, ¶ 24 (quoting *BMD Contractors, Inc. v. Fidelity & Deposit Co. of Maryland*, 679 F.3d 643, 649 (7th Cir. 2012)). Pay-if-paid clauses are enforceable conditions precedent. See *A.A. Conte, Inc. v. Campbell-Lowrie-Lautermilch Corp.*, 132 Ill. App. 3d 325 (1985). A pay-when-paid clause " 'governs the timing of a contractor's payment obligation to the subcontractor, usually by indicating that the subcontractor will be paid within some fixed time period after the contractor itself is paid by the property owner.' " *Beal Bank Nevada*, 2016 IL App (1st) 151697, ¶ 24 (quoting *BMD Contractors*, 679 F.3d at 648). Section 20 contains a pay-if-paid clause.

¶ 73　　In trying to avoid section 20, Bourbon relies on the language that section 20 applies if the general contract is "terminated or the progress of the Work delayed due to conditions which PEPPER cannot control." Bourbon states that section 20 only comes into play if the general contract is terminated due to conditions that Pepper cannot control and, here, the evidence established that the general contract was terminated due to conditions within Pepper's control. Pepper invokes the last antecedent rule to assert that "due to conditions which PEPPER cannot control" applies only to delays. Even under Bourbon's interpretation, section 20 still applies here because there was evidence to find that the general contract was terminated due to conditions that Pepper could not control.

¶ 74　　The last antecedent rule provides that a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows. *Lockhart v. United States*, 577 U.S. 347, 351 (2016); see also *Advincula v. United Blood Services*, 176 Ill. 2d 1, 26 (1996) (it is generally accepted that a qualifying phrase refers solely to the last antecedent). The last antecedent rule "is a grammatical canon of construction resorted to only when terms are ambiguous." *State Farm Mutual Automobile Insurance Co. v. Murphy*, 2019 IL App (2d) 180154, ¶ 35. Pepper does not contend that section 20 is ambiguous. Quite the opposite—

- 17 -

Pepper asserts in its opening brief that section 20 is "clear, unambiguous, and fully enforceable under Illinois law."

¶ 75    We do not need to definitively resolve whether "due to conditions which PEPPER cannot control" applies to both a termination and a delay. Even under Bourbon's more restrictive reading—in which section 20 applies only if the termination was due to conditions that Pepper could not control—there was evidence to support that this requirement was met. We note again that, after a bench trial, the trial court's judgment will be upheld if there is any evidence supporting it. *Walker v. Chicago Housing Authority*, 2015 IL App (1st) 133788, ¶ 47. Kenneth Egidi, Pepper's president, testified that the owner's representative ignored the original sequence of construction and gave Pepper directions that were driven by the homeowners. Brian Peter, a Pepper project executive, testified that documents were not issued in a logical sequence and the volume of design information and changes were more than what Pepper and the subcontractors could have imagined. Peter further stated that Pepper stopped working because Palmolive changed its philosophy about change requests and Pepper wanted to protect itself and the subcontractors. Jay Jacobsmeyer, another Pepper employee, also testified about the project's difficulties and how it deviated from the original plan. Louis Davis testified that the owner was to blame for the project's problems. Although there was evidence presented that Pepper was to blame for the project's deterioration, there was more than sufficient evidence to find that the general contract was terminated for conditions Pepper could not control.

¶ 76    Bourbon further attempts to avoid section 20 by stating that Pepper breached the subcontract and that a party who materially breaches a contract cannot take advantage of the terms of the contract that benefit him, citing *James v. Lifeline Mobile Medics*, 341 Ill. App. 3d 451, 455 (2003). According to Bourbon, Pepper failed to pay Bourbon, falsely accused Bourbon of delays, and falsely assured Bourbon that its claims would be resolved by the end of the job. Pepper's failure to pay is governed by section 20. Bourbon does not specifically identify in its brief other provisions of the subcontract that Pepper breached and how those supposed breaches would prevent section 20 from controlling the outcome. Thus, the point is forfeited. Ill. S. Ct. R. 341(h)(7), (i) (eff. Oct. 1, 2020) (points not argued are forfeited, and this rule applies to both parties' briefs).

¶ 77    So, the trial court correctly found that section 20 controlled Bourbon's recovery. We next consider whether Pepper fulfilled its obligation to Bourbon under that section. Based on the plain language of section 20, Bourbon was entitled to payment for materials and labor only if Pepper was actually paid by Palmolive for those costs. The issue is whether Pepper was actually paid by Palmolive for Bourbon's materials and labor. Again, Pepper contends that Palmolive actually paid Pepper no more than about 66% of the amount awarded by the arbitrators but that Pepper paid the full amount attributed by the arbitrators for Bourbon's claims.

¶ 78    We uphold the trial court's judgment if there is any evidence to support it. *Southwest Bank of St. Louis v. Poulokefalos*, 401 Ill. App. 3d 884, 890 (2010). Here, the record supports that Pepper was paid by Palmolive for Bourbon's materials and labor, but Pepper did not pay Bourbon for those costs. The trial court found that, via the settlement, Pepper was paid by Palmolive in full for its claims. Pepper admits in its reply brief that the settlement encompassed the subcontractors' pass-through claims. Pepper was paid by Palmolive in March 2012, then, for Bourbon's costs. Pepper does not dispute the measure of materials and labor costs that Bourbon incurred. Pepper made two previous payments to Bourbon—one for $850,000 and

one for $250,000. It was undisputed that the $850,000 payment was made so that Bourbon would release its liens, and Pepper was credited this amount at trial. There was conflicting testimony about the purpose of the $250,000 payment. Larry Bourbon testified that the payment was for past-due invoices. Brian Peter testified that the $250,000 payment was to help offset upcoming arbitration costs. Based on Peter's testimony about the purpose of the payment, there was evidence to support a finding that Pepper did not pay Bourbon for materials and labor that had been actually paid to Pepper by Palmolive. The trial court correctly applied section 20 and found that Bourbon could recover for materials and labor.

¶ 79                                        2. The JILA

¶ 80        Pepper next contends that the JILA barred Bourbon's claims. Pepper states that Bourbon expressly agreed that the arbitration award would be its "sole and exclusive compensation" for its claims, but Bourbon was allowed to recover additional funds from Pepper for the very same claims. Pepper asserts that the facts found salient by the circuit court in finding the JILA not relevant—that Bourbon did not directly present its claims to the arbitrators, Bourbon was not formally a party to the arbitration, there was no award directly to Bourbon, and there was no determination of any disputes between Bourbon and Pepper—underscore that the arbitration proceeded precisely as contemplated by the JILA.

¶ 81        In response, Bourbon asserts that the JILA established a condition precedent that was not met. Bourbon states that, because the arbitrators did not make an express, binding determination on the amount due and owing to Bourbon, the JILA's "sole and exclusive compensation" provision did not limit Pepper's liability. Bourbon also argues that the JILA's performance became impossible when the arbitrators refused to apply the JILA as written.

¶ 82        In construing the JILA, our primary objective is to determine and give effect to the parties' intent at the time they entered into the agreement. *Urban Sites of Chicago, LLC*, 2012 IL App (1st) 111880, ¶ 24. "When presented with clear and unambiguous language, the intent of the parties must be determined from the language of the contract itself and given its plain and ordinary meaning." *Storino, Ramello & Durkin*, 2015 IL App (1st) 142961, ¶ 18. We consider the document as a whole, rather than focusing on isolated portions. *Premier Title Co.*, 328 Ill. App. 3d at 164.

¶ 83        The JILA contained numerous provisions for how Pepper and the subcontractors would present their claims against Palmolive at arbitration. In part, Pepper would include the subcontractors' claims in Pepper's presentation against Palmolive, and the subcontractors would accept full responsibility for the presentation of evidence in support of their claims. Pepper had overall responsibility for all matters asserted and retained final decision-making authority, but each subcontractor would present its own claim. Each subcontractor agreed "to accept as their sole and exclusive compensation for its Subcontractor Claim as part of the Arbitration Proceeding, the amount *** as determined by the Arbitrators to be due and owing each Subcontractor" from Palmolive, Pepper, and/or each other, except for backcharges or other open issues. The JILA provided that an award would be distributed as provided in a Reasoned Award, which would expressly identify each subcontractor by name and set forth the amount awarded each, with a legal and factual basis.

¶ 84        It appears that certain aspects of the JILA may not have come to fruition. Although the JILA does not explicitly state that the subcontractors were to proceed as individual parties, the arbitrators did not treat the subcontractors as separate parties, and instead, their attorneys

- 19 -

served as cocounsel to Pepper. Further, the arbitrators' award was to Pepper. The award did not include an amount due to each subcontractor and did not give factual and legal reasons for an award to each subcontractor.

¶ 85　　The "amount *** as determined by the Arbitrators to be due and owing each Subcontractor" was supposed to be the subcontractors' sole and exclusive compensation. The next question is the impact of the unfulfilled provision. Whether, as Bourbon suggests, the provision was a condition precedent for enforcing the JILA is unclear. "[A] condition precedent is one that must be met before a contract becomes effective or that is to be performed by one party to an existing contract before the other party is obligated to perform." (Internal quotation marks omitted.) *Catholic Charities of Archdiocese of Chicago v. Thorpe*, 318 Ill. App. 3d 304, 307 (2000). Where a contract contains a condition precedent, the contract does not become enforceable or effective until the condition is performed or the contingency occurs. *Midwest Builder Distributing, Inc. v. Lord & Essex, Inc.*, 383 Ill. App. 3d 645, 668 (2007). "Whether an act is necessary to the formation of the contract or to the performance of an obligation under the contract depends on the facts of the case." (Internal quotation marks omitted.) *Thorpe*, 318 Ill. App. 3d at 307. The JILA covered many topics and the parties performed other obligations under the JILA. Bourbon has not explained how receiving an individual award was necessary to form the contract.

¶ 86　　What we are left with is that the "sole and exclusive compensation" provision in the JILA was not fulfilled, but this outcome did not render the entire JILA ineffective or unenforceable. Under the plain language of the agreement, because there was no amount determined to be due to Bourbon, Bourbon did not have to accept the arbitration award as its "sole and exclusive compensation." The JILA did not bar Bourbon's claims against Pepper.

¶ 87　　Although we have found that the JILA does not bar Bourbon's claims for the reasons we discussed above, for the sake of completeness, we address Bourbon's assertion that performance of the JILA was rendered impossible. "The doctrine of legal impossibility, or impossible performance, excuses performance of a contract only when performance is rendered objectively impossible either because the subject matter is destroyed or by operation of law." *Innovative Modular Solutions v. Hazel Crest School District 152.5*, 2012 IL 112052, ¶ 37. Performance can be made impossible by judicial action. *Felbinger & Co. v. Traiforos*, 76 Ill. App. 3d 725, 733 (1976). Impossibility of performance is an affirmative defense to a breach of contract claim and grounds to rescind or abandon a contract. *YPI 180 N. LaSalle Owner, LLC v. 180 N. LaSalle II, LLC*, 403 Ill. App. 3d 1, 2-3 (2010). The doctrine is narrowly applied based on "judicial recognition that the purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances." *Rosenberger v. United Community Bancshares, Inc.*, 2017 IL App (1st) 161102, ¶ 24. The party advancing the doctrine has the burden of proving impossibility. *Id.*

¶ 88　　To the extent that Bourbon seeks to set aside the JILA due to impossibility, it has acted too late. Even if the arbitrators constrained Bourbon more than it anticipated at the outset, Bourbon forfeited the opportunity to rescind the JILA based on impossibility. See *YPI 180 N. LaSalle Owner, LLC*, 403 Ill. App. 3d at 6 (right to rescind a contract must be exercised promptly on discovery of facts that confer right to rescind or right is waived); see also *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 26 (forfeiture applies when an issue is not raised in a timely manner). After the arbitrators issued an order that limited the subcontractors' participation, Bourbon proceeded in the arbitration. Counsel appeared at

arbitration to present Bourbon's claim under the JILA and examined two witnesses, including an expert that was retained by Bourbon. *Pepper I*, 2016 IL App (1st) 142754, ¶ 11. Bourbon cannot invoke the impossibility doctrine to set aside the JILA.

¶ 89                                  3. Unjust Enrichment

¶ 90        Pepper next contends that the trial court erred in entering judgment for Bourbon on its unjust enrichment claim because written contracts governed the parties' relationship. Pepper argues that the JILA governed the subject matter of the unjust enrichment claim—the allocation of costs incurred in presenting Bourbon's claims at arbitration.

¶ 91        In response, Bourbon again tries to set aside the JILA, asserting that the JILA was effectively rendered unenforceable by the arbitration panel and there was less than substantial compliance with the JILA. Bourbon also contends that the JILA does not govern the parties' relationship as it relates to Bourbon's fees and costs in the arbitration because the circuit court found that the JILA did not apply. Bourbon also asserts that, even if the JILA governed the arbitrators' fee award, Pepper would have to pay Bourbon the fees it recovered from Palmolive on Bourbon's behalf.

¶ 92        Unjust enrichment is an equitable remedy based on a contract implied in law. *Guinn v. Hoskins Chevrolet*, 361 Ill. App. 3d 575, 604 (2005). To recover, a plaintiff must show that a defendant voluntarily accepted a benefit that would be inequitable to retain without payment. *People ex rel. Hartigan v. E&E Hauling, Inc.*, 153 Ill. 2d 473, 497 (1992). A party cannot assert a claim on a contract implied in law if an express contract exists between the parties concerning the same subject matter. *Archon Construction Co. v. U.S. Shelter, L.L.C.*, 2017 IL App (1st) 153409, ¶ 33; see also *Utility Audit, Inc. v. Horace Mann Service Corp.*, 383 F.3d 683, 689 (7th Cir. 2004) (in determining whether a claim falls outside a contract, the subject matter of the contract governs, not whether the contract contains terms or provisions related to the claim); *E&E Hauling, Inc.*, 153 Ill. 2d at 497 (unjust enrichment not available where a specific contract governs the parties' relationship).

¶ 93        The JILA has never been found unenforceable. Further, as discussed above, by participating in the arbitration, Bourbon forfeited the argument that the JILA should be rescinded. Bourbon cites *Miller v. Racine Trust*, 65 Ill. App. 3d 207, 215 (1978), to assert that quasicontractual recovery is appropriate where there has been less than substantial compliance by the parties to an agreement. But nowhere does *Miller* discuss unjust enrichment, and Bourbon does not explain how *Miller* applies, other than citing the appellate court's statement that the plaintiff was entitled to recovery for labor and materials even though the trial court's finding of substantial compliance by the plaintiff was against the manifest weight of the evidence. See *id.*

¶ 94        Moreover, we agree with Pepper that the JILA addresses the same subject matter as the unjust enrichment claim. The JILA governed the parties' entire relationship with respect to the arbitration, including how it would be paid for. Under the JILA, each subcontractor "[assumed] financial responsibility" for presenting its own claim, "including the payment for its counsel, consultants, experts, and representatives/employees." The JILA further provided that, "[i]n the event one of the Parties hereto is determined to be a 'prevailing party' by the Arbitrators, [Pepper] agrees to submit and prosecute such 'prevailing party's' claims for attorneys' fees and costs or allow the Subcontractor to do so in [Pepper's] name at its own expense." Any amount recovered from the proceeding was to be distributed as provided in a Reasoned Award,

which would expressly identify each subcontractor by name and set forth explicitly the amounts to be awarded for their respective claims, with a factual and legal basis.

¶ 95    Unfortunately for Bourbon, the avenue for recovering attorney fees contemplated by the JILA—the issuance of a Reasoned Award—did not occur. The arbitrators made clear that the subcontractors were not parties. Instead, Pepper was the prevailing party, and the award was to Pepper. The award did not set forth a legal and factual basis for an award to Bourbon. Further, Pepper did not ultimately take the arbitration award. Instead, Pepper settled with Palmolive. There was no arbitration award to distribute to Bourbon, much less the Reasoned Award contemplated in the JILA, complete with attorney fees and costs.

¶ 96    Bourbon's expectations for recovering attorney fees via the JILA were not realized, which was a risk it assumed when it entered into the JILA and then participated in the arbitration. Bourbon cannot turn to unjust enrichment to recover. "Quasi-contract is not a means for shifting a risk one has assumed under contract." *Industrial Lift Truck Service Corp. v. Mitsubishi International Corp.*, 104 Ill. App. 3d 357, 361 (1982). While this result may seem harsh, we note that Pepper paid Bourbon $250,000 before the arbitration to help offset the associated financial burden. Based on our conclusion that unjust enrichment was not available as a matter of law, we will not address Pepper's argument that Bourbon did not fulfill the elements for an unjust enrichment claim. The judgment in favor of Bourbon on its unjust enrichment claim is reversed.

¶ 97                                        4. Prevailing Party

¶ 98    We next turn to Pepper's contention that Bourbon was not the prevailing party. Pepper asserts that the judgment should be reversed and therefore Pepper should be deemed the prevailing party. Pepper argues that, even if the judgment is affirmed, the trial court abused its discretion by finding that Bourbon was the prevailing party. Pepper states that the trial court did not consider its victories and that Bourbon's victories were not significant relative to the value, complexity, or time devoted at trial to the claims and issues on which Bourbon lost. Pepper also contends that the subcontract does not allow the prevailing party to recover attorney fees for unjust enrichment claims.

¶ 99    A party is generally responsible for his own attorney fees, but there is an exception where a contract, as here, provides for an award of attorney fees. *J.B. Esker & Sons, Inc. v. Cle-Pa's Partnership*, 325 Ill. App. 3d 276, 281 (2001). Section 19 of the subcontract, titled "Legal Fees," states:

> "In the event any legal proceeding, arbitration or other form of dispute resolution procedure is commenced between the parties to this Agreement, whether in contract or in tort, the prevailing party shall be entitled, in addition to such other relief as may be granted, to a reasonable sum for attorneys' fees and costs, which sum shall be determined by the court or forum in such proceeding."

¶ 100   A party can be considered a prevailing party for the purposes of a fee award when it is successful on any significant action and achieves some benefit in bringing suit, receives a judgment in its favor, or obtains an affirmative recovery. *Grossinger Motorcorp, Inc. v. American National Bank & Trust Co.*, 240 Ill. App. 3d 737, 753 (1992). A party can be the prevailing party even if it does not succeed on all matters. *1002 E. 87th Street, LLC v. Midway Broadcasting Corp.*, 2018 IL App (1st) 171691, ¶ 31. Whether and in what amount to award attorney fees is in the trial court's discretion, and we review the trial court's decision for an

abuse of that discretion. *Thomas v. Weatherguard Construction Co.*, 2018 IL App (1st) 171238, ¶ 61.

¶ 101    The facts have changed since the trial court determined that Bourbon was the prevailing party. In light of our reversal of the judgment for Bourbon on its unjust enrichment claim, the trial court must consider whether Bourbon is still the prevailing party. The trial court is in a better position to weigh the various factors involved, including the relative value and complexity of the issues presented and the amount of time the parties devoted to each issue. See *Oak Forest Properties, LLC v. RER Financial, Inc.*, 2018 IL App (1st) 161704, ¶ 17. The trial court may find that neither party is the prevailing party now that Pepper and Bourbon have won and lost claims in this trial. See *Timan v. Ourada*, 2012 IL App (2d) 100834, ¶ 29 (when the dispute involves multiple claims and both parties have won and lost on different claims, it may be inappropriate to find that either party is the prevailing party and an award to either is inappropriate); *Brown & Kerr, Inc. v. American Stores Properties, Inc.*, 306 Ill. App. 3d 1023, 1034 (1999) (neither party was the prevailing party where they both won and lost on claims in the circuit court). At the same time, where only some of a plaintiff's claims are successful, attorney fees may be allowed for all claims involving a common core of facts or based on related legal theories. *Thomas*, 2018 IL App (1st) 171238, ¶ 63. These are matters for the trial court acting in its discretion, based on the changed circumstances on remand.

¶ 102    Because the trial court may determine that Bourbon is not the prevailing party and not entitled to attorney fees, we will not address Pepper's argument that section 19 of the subcontract does not allow attorney fees for an unjust enrichment claim. We do not review cases merely to guide future litigation or set precedent. *In re Appointment of Special Prosecutor*, 253 Ill. App. 3d 218, 224 (1993).

¶ 103                              B. Bourbon's Cross-Appeal

¶ 104    On cross-appeal, Bourbon contends that the trial court erred by (1) limiting the breach of contract damages to $198,796, (2) awarding prejudgment interest on the breach of contract claim from March 2012 instead of March 2007, and (3) excluding from Bourbon's award of attorney fees and costs the amount spent to develop and present the total cost damages theory. We consider each issue in turn.

¶ 105                              1. Breach of Contract Damages

¶ 106    Bourbon makes three arguments in support of its position that its breach of contract damages were incorrectly limited.

¶ 107                              a. Judicial Admission

¶ 108    Bourbon contends that Pepper judicially admitted that the amount of unpaid materials and labor expended by Bourbon on the project was $2,813,755.40. According to Bourbon, Pepper made this judicial admission via its FAML, which included an affidavit signed by Pepper's general counsel at the time. Bourbon also notes that the FAML was incorporated into a complaint. Bourbon further states that, in interrogatory answers, Pepper admitted that the FAML included the sum of $2,813,755.40 for materials and labor supplied by Bourbon. Bourbon argues that the Mechanics Lien Act (Act) (770 ILCS 60/1 *et seq.* (West 2018)) and Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018) support concluding that Pepper judicially

admitted the amount of Bourbon's damages. Bourbon also asserts that testimony from Pepper's witnesses indicates that Pepper had independent knowledge of the amount owed to Bourbon.

¶ 109 Pepper incorrectly states that the law of the case doctrine bars Bourbon's reliance on a judicial admission. *Pepper I* did not consider whether statements in the FAML, combined with the complaint and answers to interrogatories, were judicial admissions. See *Diocese of Quincy v. Episcopal Church*, 2016 IL App (4th) 150193, ¶ 28 (law of the case doctrine limits relitigation of a previously decided issue in the same case).

¶ 110 Turning to the merits, a judicial admission is a deliberate, clear, unequivocal statement by a party concerning a concrete fact within that party's knowledge. *In re Estate of Ivy*, 2019 IL App (1st) 181691, ¶ 64. Where made, a judicial admission cannot be contradicted in a motion for summary judgment or at trial. *Roti v. Roti*, 364 Ill. App. 3d 191, 200 (2006). It is unresolved whether a court reviews *de novo* or for an abuse of discretion whether a statement is a judicial admission. *North Shore Community Bank & Trust Co. v. Sheffield Wellington LLC*, 2014 IL App (1st) 123784, ¶¶ 117-18. However, cases applying either standard agree on the same basic framework. *Id.* ¶ 119. To be a judicial admission, the statement must be clear, unequivocal, and uniquely within the party's personal knowledge. *Id.* Further, the statement must be given a meaning consistent with the surrounding context and must be considered in relation to the other testimony and evidence presented. *Id.* ¶ 118.

¶ 111 The purported judicial admission here arises from three documents. The first is the FAML, attested to by Pepper's general counsel, which stated that the balance due and owing to Pepper was $34,033,678.44 for work performed through March 25, 2007. The FAML stated:

> "The Lien Claimant and Owner have been given notice of subcontractor liens that have been incorporated to the extent currently known by Lien Claimant into the amount claimed by Lien Claimant herein and Lien Claimant expressly reserves the right to include additional amounts related to subcontractor liens or claims that Lien Claimant may deem to be properly due from Owner."

The second document was Pepper's third amended complaint to foreclose the mechanic's lien, to which the FAML was attached as an exhibit. Bourbon notes that the affidavit became part of the pleading and should be construed as a judicial admission. See 735 ILCS 5/2-606 (West 2018); *Capital One Bank, N.A. v. Czekala*, 379 Ill. App. 3d 737, 744 (2008). The third document was Pepper's answer to an interrogatory that asked Pepper to identify any portion of Pepper's liens attributable to work performed by Bourbon. Pepper stated, "Pepper's Claim for Mechanics Lien Amendment No. 4, recorded on July 24, 2007, contained amounts that Bourbon provided to Pepper as the amount that Bourbon claimed to be due on Bourbon's pass-through claim at that time in the sum of $2,813,755.40." Though not explicitly stated in the FAML itself, we assume that the balance in Pepper's FAML included the sum of $2,813,755.40 on account of Bourbon's pass-through claim.

¶ 112 Contrary to Bourbon's assertion, the Act does not support a finding that Pepper judicially admitted the amount of Bourbon's damages. The purpose of the Act is "to require a person with an interest in real property to pay for improvements or benefits which have been induced or encouraged by his *** own conduct." (Internal quotation marks omitted.) *Father & Sons Home Improvement II, Inc. v. Stuart*, 2016 IL App (1st) 143666, ¶ 29. To be enforceable against third parties, a lien claim must be filed within four months after the work is completed. 770 ILCS 60/7(a) (West 2018). A lien claim must include "a brief statement of the claimant's contract, the balance due after allowing all credits, and a sufficiently correct description of the

lot." *Id.* The claim must be verified by the affidavit of the contractor, or his agent or employee. *Tefco Construction Co. v. Continental Community Bank & Trust Co.*, 357 Ill. App. 3d 714, 720 (2005). "By requiring verification of the claim, \*\*\* section 7 provides that the claimant must make statements in the recorded document under penalty of perjury, which provides a much needed consequence should the claimant file a frivolous claim under the Act." *Id.* at 722.

¶ 113    Bourbon asserts that the facts asserted in a sworn lien constitute the lien claimant's formal binding admissions of fact, citing *Braun-Skiba, Ltd. v. La Salle National Bank*, 279 Ill. App. 3d 912 (1996), and *Mutual Services, Inc. v. Ballantrae Development Co.*, 159 Ill. App. 3d 549 (1987). In both cases, the plaintiffs were bound by the incorrect completion dates on their liens. *Braun-Skiba, Ltd.*, 279 Ill. App. 3d at 913, 917-18 (completion date on lien was more than two years before filing); *Mutual Services, Inc.*, 159 Ill. App. 3d at 551, 553 (completion date on lien was more than four months before filing). Again, section 7 of the Act requires that the claimant file the lien within four months after the work is complete (770 ILCS 60/7(a) (West 2018)), so both liens were invalid on their face. However, a lien claimant is not bound by incorrect completion dates when the lien appears valid—in other words, when the stated completion date, though incorrect, is within four months of filing. *North Shore Community Bank & Trust Co.*, 2014 IL App (1st) 123784, ¶¶ 108, 111. The key consideration for whether information in a lien is binding is whether third parties would be misled to believe the lien was unenforceable. See *id.* ¶ 111.

¶ 114    Here, there was nothing about the amount claimed in Pepper's lien that would mislead a third party to believe the FAML was unenforceable. Section 7 of the Act even allows for the amount of the lien to be amended due to an error or overcharge, unless the error or overcharge was made with an intent to defraud. 770 ILCS 60/7(a) (West 2018). Bourbon has not suggested that Pepper intended to defraud anyone and has not provided any evidence that the FAML was fraudulent. But see *Fathers & Sons Improvement II, Inc. v. Stuart*, 2016 IL App (1st) 143666, ¶ 36 (lien defeated on the basis of constructive fraud where allegations of fraud were "not merely based on overstatements or overcharges, but rather on patently false statements" that the plaintiff used to establish its right to a mechanic's lien in the first place). That the Act permits amendments indicates that the amount claimed is not a judicial admission. Pepper was not bound to the amount included in the FAML for Bourbon's pass-through claim.

¶ 115    Our conclusion is further supported by general principles for judicial admissions. Bourbon points to the language in previous liens and the FAML that Pepper reserved the right to include additional amounts that Pepper "may deem to be properly due from Owner." According to Bourbon, Pepper thus admitted that the amounts it had already presented were properly due from Palmolive. We disagree. We consider a statement alleged to be a judicial admission in relation to the other testimony and evidence presented. *North Shore Community Bank & Trust Co.*, 2014 IL App (1st) 123784, ¶ 118. At trial, Robert Lessman, Pepper's former general counsel who signed the lien affidavit, testified that, when preparing the liens, "the computation of damages by the subcontractors was uniquely and specifically controlled by the subcontractors." Pepper only made "a very cursory review" of the subcontractors' claims. Richard Sieracki, Pepper's expert at arbitration, stated that he made sure that Bourbon's expert used an accepted method and did not indicate that he prepared or calculated the claim himself. Pepper's answer to an interrogatory stated that the amount was provided by Bourbon to Pepper and was the amount "Bourbon claimed to be due." Pepper appears to have served mainly as a conduit for the subcontractors in preparing the lien. Based on the circumstances, it is not certain

that the amount of Bourbon's claim in the FAML was a deliberate, clear, and unequivocal statement by Pepper about a concrete fact within Pepper's knowledge. See *In re Estate of Ivy*, 2019 IL App (1st) 181691, ¶ 64 (defining a judicial admission); see also *North Shore Community Bank & Trust Co.*, 2014 IL App (1st) 123784, ¶ 130 (statements were not judicial admissions where the claimant had to rely on documents to remember the date of completion and the completion date had to be estimated). The amount of Bourbon's claim in the FAML was not a judicial admission.

¶ 116                                    b. Judicial Estoppel

¶ 117      Bourbon next contends that, based on facts asserted during the arbitration proceedings, Pepper is judicially estopped from disputing that Bourbon's damages were $3,185,234. In part, Bourbon notes the testimony of Pepper's expert at arbitration, who stated he met with Bourbon representatives, made adjustments to Bourbon's claim, and reviewed the claim for consistency. Bourbon also states that, in its closing arbitration brief, Pepper sought $3,185,234 for Bourbon's work.

¶ 118      Judicial estoppel is an equitable doctrine invoked by the court at its discretion. *Seymour v. Collins*, 2015 IL 118432, ¶ 36. The purpose of the doctrine "is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." (Internal quotation marks omitted.) *Id.* To apply judicial estoppel, the party to be estopped must (1) have taken two positions (2) that are factually inconsistent, (3) in separate judicial or quasi-judicial administrative proceedings, (4) intending for the trier of fact to accept the truth of the facts alleged, and (5) have succeeded in the first proceeding and received some benefit from it. *Smith v. Integrated Management Services, LLC*, 2019 IL App (3d) 180576, ¶ 16. Judicial estoppel must be proved by clear and convincing evidence. *Johnson v. Fuller Family Holdings, LLC*, 2017 IL App (1st) 162130, ¶ 34.

¶ 119      Once again, Pepper incorrectly invokes the law of the case doctrine, asserting that judicial estoppel on liability was litigated and decided in *Pepper I*. We did not actually decide the issue in *Pepper I* that is now presented. In *Pepper I*, 2016 IL App (1st) 142754, ¶ 67, we stated that judicial estoppel should not have been applied to either party because each sought to bar the other from contesting liability, which is a legal conclusion. In this appeal, Bourbon contends that Pepper asserted facts about the amount of Bourbon's damages, a matter to which judicial estoppel could theoretically apply but does not for the reasons discussed below. See *McNamee v. Sandore*, 373 Ill. App. 3d 636, 649 (2007) (judicial estoppel applies to inconsistency in assertions of fact).

¶ 120      "[W]here a trial court has exercised its discretion in the application of judicial estoppel, we review for abuse of discretion." *Seymour*, 2015 IL 118432, ¶ 48. However, where the exercise of that discretion results in the termination of the litigation via a motion for summary judgment, we review that ruling *de novo*. *Id.* ¶ 49. Here, the circuit court denied, rather than granted, summary judgment on the basis of judicial estoppel. Generally, when a case goes to trial after a motion for summary judgment is denied, the order denying the motion for summary judgment merges with the judgment entered and is not appealable. *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶ 42. An exception to this rule is where the issue raised in the summary judgment motion presents a question of law and so would not be decided by a jury. *Id.* In that case, the denial of the summary judgment motion does not merge with the judgment and may be addressed on appeal under *de novo* review. *Id.*

¶ 121    Even under *de novo* review, judicial estoppel does not apply to Pepper's statements at arbitration about Bourbon's damages. Pepper did not clearly take a position that Bourbon's damages were a particular amount. Although *Pepper I* is not the law of the case, we find salient a statement we made there: Pepper appeared to have gone to some effort at arbitration to ensure it did not take a position on Bourbon's damages. *Pepper I*, 2016 IL App (1st) 142754, ¶ 69. Although Pepper proposed in its closing brief that the award for Bourbon's pass-through claim was $3,185,234, the context of this statement is significant. The testimony of Pepper's expert, Richard Sieracki, made clear that the subcontractors quantified their own pass-through claims. He performed "some review" of Bourbon's claim to understand it, but it is not clear that Sieracki or anyone from Pepper vouched that Bourbon's damages totaled $3,185,234. Pepper seems to have kept itself at arm's length from the exact amount of Bourbon's claim. Bourbon has not shown by clear and convincing evidence that judicial estoppel applies.

¶ 122    Bourbon's reliance on *Barack Ferrazzano Kirschbaum Perlman & Nagelberg v. Loffredi*, 342 Ill. App. 3d 453 (2003), does not persuade us otherwise. In *Loffredi*, 342 Ill. App. 3d at 457, the defendants submitted a petition for all attorney fees and costs in an arbitration but, in the circuit court, alleged that the fees were unreasonable and that the plaintiff could only recover the reasonable value of its services. The defendants' positions were diametrically opposed. *Id.* at 464. Because the defendants submitted the plaintiff's charges "as those they admitted having incurred, which were the same amounts for which they sought reimbursement" at the arbitration, the defendants could not contradict that position at a subsequent judicial proceeding. *Id.* Here, it is not clear that Pepper admitted that Bourbon's damages were a certain amount. Pepper left it to Bourbon to quantify its claim. The position of Pepper on Bourbon's damages is much murkier than the defendants' position on the amount of fees in *Loffredi*. The circuit court properly found that judicial estoppel did not apply.

¶ 123                                        c. Total Cost Damages
¶ 124    We next address Bourbon's contention that it was entitled to total cost damages, not just payment for materials and labor. Bourbon argues that it could recover reasonable overhead and profit from Pepper.

¶ 125    Bourbon combines portions of the subcontract, general contract, and general conditions to establish the right to total cost damages. Section 1 of the subcontract states, "Subcontractor shall have the same rights against PEPPER that PEPPER has against the Owner." The general contract states that it incorporates AIA Document A201-1997, General Conditions of the Contract for Construction. See generally American Institute of Architects, AIA Document Comparative, A201-1997 Compared to A201-1997 (2007), https://content.aia.org/sites/default/files/2017-02/A201-2007-A201-1997%20Comparative.pdf [https://perma.cc/5PYQ-YS9D]. Section 14.4.3 of the general conditions states, "In case of *** termination for the Owner's convenience, the Contractor shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed." Bourbon asserts that, because Bourbon has the same rights against Pepper as Pepper has against Palmolive and the general contract incorporates the general conditions, Pepper and Bourbon can be substituted for Palmolive and Pepper, respectively, in section 14.4.3 of the general conditions. Thus, according to Bourbon, section 14.4.3 entitles Bourbon, in a not-for-cause termination by Pepper, to reasonable overhead and profit.

¶ 126    Bourbon's argument presents a question of contract interpretation subject to *de novo* review. *Storino, Ramello & Durkin*, 2015 IL App (1st) 142961, ¶ 18. The primary goal in construing a contract is to give effect to the parties' intent. *Premier Title Co.*, 328 Ill. App. 3d at 164. When the language is clear, we must determine the parties' intent solely from the plain language of the contract. *Id.*

¶ 127    There is a conflict between whether section 20 controls—and Bourbon recovers materials and labor—or section 14.4.3 of the general conditions controls—and Bourbon recovers reasonable overhead and profit. As discussed above, section 20 of the subcontract provides that, if the general contract is terminated or the work is delayed due to conditions that Pepper cannot control, then Pepper may terminate the subcontract and Bourbon can recover materials and labor. We previously concluded that section 20 controls the dispute, so we are not persuaded by Bourbon's refrain that section 20 does not apply for the reasons it urged when responding to Pepper's appeal.

¶ 128    Bourbon's alternative argument is that section 20 applies to a for-cause termination of the subcontract resulting from the general contract's termination due to conditions outside Pepper's control. But section 20 contains no language that it only applies to a for-cause termination. Unless there is an ambiguity—and here there is not—"a court must treat the language in a contract as a matter of law and construe the contract according to its language, not according to the constructions which the parties place on this language." *J.M. Beals Enterprises, Inc. v. Industrial Hard Chrome, Ltd.*, 194 Ill. App. 3d 744, 748 (1990).

¶ 129    We find that section 20 controls over section 14.4.3 of the general conditions. Section 1 of the subcontract states that, if there is a conflict between "the Contract Documents and this Subcontract, the more stringent term *** shall be required." Section 20 is the more stringent term, as it addresses the specific situation of Pepper terminating the subcontract after the general contract is terminated and limits Bourbon's recovery to materials and labor. To apply Bourbon's interpretation, where section 14.4.3 of the general conditions controls, would eliminate section 20, which addresses precisely the scenario that occurred here. A court will not interpret a contract in a way that would nullify or render provisions meaningless. *Thompson v. Gordon*, 241 Ill. 2d 428, 442 (2011). Bourbon was allowed to recover materials and labor under section 20 of the subcontract, and the trial court correctly found that Bourbon was not entitled to damages on a total cost basis.

¶ 130    Because Bourbon cannot recover total cost damages, we will not address its argument that its damages expert properly calculated damages under the total cost method.

¶ 131                                    2. Motion to Strike

¶ 132    The portion of Bourbon's reply brief that addressed total cost damages prompted Pepper to file a motion to strike, which was taken with the case. Pepper asserted that Bourbon improperly responded to arguments raised by Pepper in Pepper's appeal related to section 20 of the subcontract.

¶ 133    Illinois Supreme Court Rule 343(b)(1) (eff. July 1, 2008) states that a cross-appellant's reply brief must be "confined strictly to replying to those arguments raised on the cross-appeal." See also *Skarin Custom Homes, Inc. v. Ross*, 388 Ill. App. 3d 739, 742 (2009) (the defendants made impermissible surreply where their cross-appeal reply brief included arguments that were directed against the plaintiff's reply in the plaintiff's appeal); *Zabel v. Cohn*, 283 Ill. App. 3d 1043, 1048 n.2 (1996) (cross-appellants' reply brief should be limited

to responding to arguments raised in the cross-appeal). We recognize that a brief can broaden the arguments to which a party can reply. See *Polsky v. BDO Seidman*, 293 Ill. App. 3d 414, 419 (1997). That scenario did not occur here. In its response to Bourbon's cross-appeal, Pepper stated that section 20 controlled the outcome of the case for the reasons it had previously set forth. Bourbon's cross-appeal reply brief then raised arguments about the last antecedent rule, Pepper's conduct during the project, and implied contractual duties. These arguments were directed at Pepper's appeal. We do not construe Pepper's brief, general reference in its cross-appeal response brief to its previous arguments about section 20 as an invitation for Bourbon to respond to those arguments in detail and raise new points. We strike those portions of Bourbon's cross-appeal reply brief that are improper surreply and have not considered them.

¶ 134                                3. Prejudgment Interest

¶ 135        Bourbon next contends that the trial court incorrectly limited prejudgment interest on the breach of contract claim. According to Bourbon, interest owed began to accrue, at the latest, on Bourbon's last day of work in March 2007 and not on the day that Pepper settled its dispute with Palmolive in March 2012. Bourbon states that, when Pepper settled with Palmolive, Pepper was paid in full, including interest. Further, Palmolive's unallocated lump-sum payment encompassed all the interest owed to Bourbon, which accrued no later than March 2007.

¶ 136        Bourbon's right to prejudgment interest is governed by the subcontract and the general contract. Thus, Bourbon's argument raises a question of contract interpretation that we review *de novo*. *Storino, Ramello & Durkin*, 2015 IL App (1st) 142961, ¶ 18. As noted above, section 1 of the subcontract states that the subcontractor has the same rights against Pepper that Pepper has against Palmolive. Section 13.6.1 of the general conditions, which is incorporated into the general contract, states that payments due and unpaid "shall bear interest from the date payment is due." And under section 20 of the subcontract—which we have found controls Bourbon's recovery—Bourbon may recover materials and labor once Pepper is paid by Palmolive. Two other sections of the subcontract provide that payment to Bourbon is due once Pepper is paid. Section 8 provides that Pepper's obligation to pay Bourbon "is contingent upon receipt of payment" from Palmolive for Bourbon's work. Section 44(I)(4) states that Palmolive's payment to Pepper is a condition precedent to Pepper's obligation to pay Bourbon. Under the plain language of the subcontract, payment to Bourbon was due when Pepper was paid by Palmolive. Pepper was paid by Palmolive in March 2012 when they settled. Interest began accruing on that date. The trial court correctly calculated prejudgment interest.

¶ 137                      4. Attorney Fees and Costs for Total Cost Theory

¶ 138        Lastly, Bourbon contends that the trial court abused its discretion when it denied fees and costs incurred in developing and presenting its total cost damages theory. We will not address this argument. As stated above, the circuit court must first determine whether Pepper, Bourbon, or neither party is the prevailing party. The circuit court can then determine to what fees and costs the prevailing party is entitled. See *Thomas*, 2018 IL App (1st) 171238, ¶ 61 (whether and in what amount to award attorney fees is within the trial court's discretion).

¶ 139                          III. CONCLUSION

¶ 140          For the foregoing reasons, we affirm the trial court's judgment in favor of Bourbon on its breach of contract claim. We reverse the trial court's judgment in favor of Bourbon on its unjust enrichment claim. The cause is remanded for further proceedings consistent with this opinion.

¶ 141          Affirmed in part and reversed in part.

¶ 142          Cause remanded.