2024 IL App (2d) 230525-U
No. 2-23-0525
Order filed June 18, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF LYNN HAGAN, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 20-D-411 |
| | ) | |
| JOHN HAGAN, | ) | Honorable |
| | ) | Jacquelyn D. Melius, |
| Respondent-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Schostok and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in finding conscionable and enforcing the parties' marital settlement agreement and in awarding petitioner attorney fees.  Affirmed.

¶ 2    Petitioner, Lynn Hagan, petitioned to dissolve her marriage to respondent, John Hagan. The parties entered into a marital settlement agreement, and John sought to vacate it.  The trial court denied John's motion and his subsequent motion to reconsider and awarded Lynn attorney fees.  John appeals, arguing that (1) the agreement is unenforceable because it lacks the requisite specificity and definiteness; (2) it should be rescinded because the court liquidated an account from which John was due funds, as provided in the agreement; (3) it is unconscionable because it is one-

sided and he felt deprived of meaningful choice when he executed it; and (4) the court abused its discretion in ordering him to contribute $35,000 toward Lynn's attorney fees. We affirm.

¶ 3                                             I. BACKGROUND

¶ 4     The parties were married in 1987 and had two children who are emancipated. On March 9, 2020, Lynn petitioned to dissolve the marriage. Both parties were 58 years old at that time. John is employed by SEI as a client portfolio manager and earns about $300,000 per year. Lynn was a homemaker during most of the marriage and is unemployed.

¶ 5     In an agreed order, dated October 28, 2020, the parties decided that, upon the sale of their listed marital residence, the net proceeds would be deposited into a trust account. In November 2020, $95,407.32 in net sales proceeds were deposited into the trust account. In an agreed order, dated December 9, 2020, the court ordered the following sums be distributed from the trust account: $20,000 to Lynn, $20,000 to John, and $5000 each to the parties' attorneys. John agreed to pay Lynn's bills and expenses and to deposit $1500 per month in their joint checking account for Lynn's sole use.

¶ 6     In a June 7, 2021, order, the trial court directed John to pay Lynn maintenance of $5700 per month (based on his $296,868.87 in gross income and Lynn's zero income). Lynn sought reconsideration of this order, arguing that the maintenance amount should have been $7464.33 per month (based on $298,572 in gross income) and that she was entitled to 32 years and 5 months of maintenance. On August 2, 2021, the trial court issued a rule to show cause against John for changing the beneficiary on the parties' life insurance policies to exclude Lynn, for his failure to provide documentation, and for his failure to provide an accounting of a bonus he received from his employer. On September 20, 2021, the trial court denied Lynn's request to reconsider the maintenance amount, ordering that it remain at $5700 per month. The court also granted Lynn

$10,000 as a partial distribution of her request for interim attorney fees, to be paid from the trust account. The trial court subsequently, on November 10, 2021, ordered John to pay $7500 in Lynn's interim attorney fees and later, on July 7, 2022, ordered him to pay $34,000 in her interim fees from the trust account. On October 7, 2022, Lynn petitioned for attorney fees contribution, requesting $75,000 in contribution from John.

¶ 7                         A. Memorandum of Understanding

¶ 8      The case was for set for trial on November 16, 2022, but the parties agreed to a pretrial conference regarding all issues.

¶ 9      On that date, the parties entered into a memorandum of understanding, which provides as follows. John will pay Lynn $5700 net per month in maintenance, which was "based upon John's based income and bonus income." John also agreed to pay up to $850 per month toward Lynn's health insurance and to pay her $70,000 over six years. "All allegations of dissipation are hereby resolved." The parties would divide all marital assets 80/20, except that John would receive 125 points from a Disney timeshare and their jet skis and trailers. All debt, excluding IRS debt through the 2022 year, would be divided 90/10, with John paying 90% and Lynn paying 10%. John would receive $3500 from the trust account, and Lynn would receive any remaining proceeds. The parties would equally share the existing marital frequent flyer miles and hotel points. The parties would also exchange bank and credit card statements within 72 hours to facilitate drafting of the dissolution judgment.

¶ 10     On December 1, 2022, the trial court ordered John to produce documentation of his frequent flyer and hotel points and ordered Lynn to produce her father's (with whom she lives in Florida) bank statements.

¶ 11    On December 15, 2022, John moved to vacate the memorandum of understanding, asserting that, upon exchanging bank statements, he learned that Lynn received several bank deposits: $4000 in September and $3000 and $100 in November.  He argued that Lynn was receiving a stream of income for which he was entitled to additional information, as she represented that she was unemployed and did not receive income.  John also argued that he believed that his contribution to Lynn's health insurance should terminate when she becomes eligible for Medicare (asserting this was explicitly memorialized in his and Lynn's settlement letters, which are not contained in the record on appeal).  He asserted that, given this newly discovered information regarding Lynn's stream of income, the memorandum of understanding should be vacated as inequitable and unjust.  Alternatively, he argued that the agreement be modified to account for the stream of income or to allow him time to investigate.

¶ 12    Also on December 15, Lynn filed an emergency petition to enforce the memorandum of understanding and for attorney fees.  She noted that she has a high school education and is in poor health.  John, Lynn alleged, began having an extra-marital affair with her best friend about 10 years earlier, and he depleted the marital estate, including all retirement plans.  She also asserted that John had refinanced the marital residence and withdrawn $100,000 in equity.  Lynn argued that the memorandum of understanding was clear and unambiguous and asserted that John was attempting to financially undermine her.  She also asserted that the stream of income he referenced consisted of his maintenance payments to her.  Lynn also sought attorney fees from November 16, 2022, to date and sought entry of her redlined marital settlement agreement (which is not contained in the record on appeal)+.

¶ 13    On January 6, 2023, the trial court ordered John to produce, within five business days, all documents relating to the frequent flyer miles, hotel points, and updated bank statements.  It also

ordered Lynn to produce, within five business days, all documents concerning late fees on credit cards, tax payments, a Discover credit card statement, and updated bank statements. It set the case for final prove-up.

¶ 14   On March 20, 2023, Lynn petitioned for a rule to show cause for John's alleged violation of various orders and for attorney fees. She asserted that John was ordered to pay all credit card debt but did not do so and opened credit card accounts in Lynn's name without her knowledge and that they had outstanding balances that had gone into collections. Lynn also asserted that John had removed her as a beneficiary on their life insurance policies, even though he had been ordered to reinstate her as a beneficiary on the policies.

¶ 15   On March 22, 2023, the trial court awarded Lynn $10,000 as John's contribution toward her attorney fees (of which $6404.32 would come from the remaining funds in the trust account).

¶ 16   On May 4, 2023, Lynn moved to compel entry of a dissolution judgment or to hold John in default. She argued that the parties had reached a binding settlement agreement on all terms related to their divorce. Further, Lynn asserted that: both parties signed the memorandum of understanding, they were each represented by counsel, and John's counsel drafted a marital settlement agreement that was agreed to by the parties (except for a few details regarding current outstanding debt and the payment of Lynn's attorney fees). In response, John raised the affirmative defense of fraudulent representation, arguing that Lynn delayed producing her bank statements and, once John received them, he learned that Lynn had been untruthful regarding her income. Specifically, John asserted, she received the stream of payments (via Venmo) solely in her name, he never received a copy of her Venmo account history, and she did not disclose in her financial affidavit the existence of the account. He argued that Lynn's assertion that she had no other source of income besides maintenance from him was false and that she made the statement to have John

accept settlement terms that gave her a disproportionate share of the marital estate and an extremely limited amount of marital debt.

¶ 17    On May 30, 2023, the trial court (Judge Michael G. Nerheim) entered an order granting Lynn's motion to compel entry of the dissolution judgment and ordering that the memorandum of understanding be incorporated into the marital settlement agreement.  It denied Lynn's request for attorney fees and denied John's motion to vacate the memorandum of understanding (finding it conscionable).  (The record on appeal contains no transcript from this hearing.)  In a September 14, 2023, order, the trial court (Judge Nerheim) again granted petitioner's motion to compel entry of a dissolution judgment or, in the alternative, to hold John in default.  It found that the memorandum of understanding and order entered on November 16, 2022, were binding on the parties and that the court would "enforce the same."

¶ 18    On September 22, 2023, John moved to reconsider the court's May 30 and September 14, 2023, orders, arguing for the first time that the memorandum of understanding lacked definite and certain terms (*i.e.*, it specified no time period for the maintenance obligation, did not specify which assets are marital and which are non-marital, and did not specify what the marital debts are and how they will be allocated to meet the ordered division) and that there was no meeting of the minds for it to be binding.  Also, he argued that the memorandum was unconscionable, as he was ordered to pay maintenance more than the statutory guidelines and that no basis was recited specifying what income was used.  John argued that the court changed the contract terms when it ordered that John receive $3500 from the trust, but, in a March 22, 2023, order, liquidated the account, thereby, leaving no proceeds from which he could receive the $3500.  Finally, he raised again the argument that there was no term specified for the duration of his contribution toward Lynn's health insurance.

¶ 19     On October 2, 2023, the trial court (Judge Nerheim) denied John's motion to reconsider, finding it untimely.  It noted that, on May 30, 2023, it had addressed the issues when ruling on John's motion to vacate and Lynn's motion to compel.  The court rejected John's argument that, because he raised the issue pre-decree, it was timely.

¶ 20     A prove-up hearing (before Judge Jacquelyn Melius) was also held that day.  Lynn testified that she lives in Florida with her father and has health issues, including rheumatoid arthritis, fibromyalgia, ulcerative colitis, and a hiatal hernia.  She filed a financial affidavit and testified to various credit and debit cards and bank accounts.  John testified that he was represented by counsel on November 16, 2022.  He tendered his 2022 W-2 during discovery, and it showed a gross income of $302,000.  He listed credit cards in his (September 5, 2023) financial affidavit.

¶ 21     John further testified that he signed the memorandum of understanding but that he was told twice during the hearing by the trial judge (Judge Slavin) that, if he did not sign it, he would not like the consequences. "She just said that if you don't reach an agreement, that you will not like the outcome."  "[T]hat's what made me sign it basically."  Addressing the maintenance provision, John testified that it lacked a duration.  Similarly, the medical insurance provision lacked a duration; John understood that his obligation would end when Lynn became eligible for Medicare.  Marital assets were not defined, nor were nonmarital assets.  The trust account had no assets, he asserted, as the proceeds were used for Lynn's attorney fees.  He received no money from the liquidation of the account.  The memorandum did not list the marital assets, but he filed a financial affidavit that listed all his bank accounts.

¶ 22     John stated that he did not agree, on November 16, 2022, that certain of Lynn's accounts would be designated as nonmarital accounts. During the marriage, John withdrew funds from his retirement accounts and incurred a tax penalty as a result.

¶ 23    The trial court noted that it did not find it credible that Judge Slavin pressured the parties. On October 19, 2023, the court entered an order noting that it had denied John's motion to reconsider, finding that the matter was not proved up, and setting the case for an evidentiary hearing on Lynn's petition for contribution to attorney fees.

¶ 24    On October 23, 2023, the court heard argument on the proposed dissolution settlement. Lynn testified that John did not pay her $11,666 by March of 2023. She does not have funds to further litigate the memorandum of understanding or the means to pay outstanding attorney fees. She receives $5700 per month in maintenance, does not pay rent or utilities, and she owes over $70,000 to her attorney.

¶ 25    On October 24, 2023, the trial court found that a final prove up was entered on the record and that a final dissolution judgment would be submitted to the court for entry. It continued the case for an evidentiary hearing on Lynn's petition for contribution to attorney fees. The court found that the parties could determine what is a marital asset and what was not a marital asset.

¶ 26                              B. Dissolution Judgment

¶ 27    On November 1, 2023, the trial court entered a judgment of dissolution of marriage. In its order, the court recounted that the parties had entered into the memorandum of understanding and order (which it attached to its order), which had been signed after "several conferences over several hours regarding all issues." Further, it noted that Lynn's motion to compel entry of a dissolution judgment had been granted, John's motion to vacate the memorandum was denied, and the matter was proved up on October 23, 2023. The court dissolved the marriage, incorporating by reference into the record the memorandum and order. The court ordered John to pay Lynn $5700 in maintenance as agreed to in the memorandum and order, plus up to $850 per month toward contribution for her health insurance premiums, with Lynn to obtain her own policy. It ordered

that John receive 125 points from the Disney timeshare (to be used by February 29, 2024) and that Lynn receive the timeshare as her sole property and with all remaining points. The court divided the parties' marital bank accounts 80/20, with Lynn receiving 80% of the value of the accounts and John receiving 20% of the value as of November 16, 2022. The jet skis and trailers were awarded to John. Addressing retirement accounts, the court ordered that they be divided 80/20, with Lynn receiving 80% of the value (as of November 16, 2022) and John receiving 20%. The parties were to equally divide their frequent flyer miles and hotel points as of November 16, 2022. Addressing the dissipation settlement, the court ordered John to pay Lynn $70,000 over six years as and for a property settlement. Beginning in 2024, John will "pay Lynn a sum, after the receipt of his bonus in January, but the payment shall be not later than March. The payment shall be no less than $11,666.00. Payments shall continue until the sum is paid off."

¶ 28   Next, addressing debts and liabilities, the trial court ordered that the parties' debt (excluding the IRS debt) be divided 90/10, with John paying 90% and Lynn paying 10% of their debt as of November 16, 2022. It ordered that John be solely responsible for all IRS debt through the tax year 2022. "The Court believes that the parties can determine what's a marital asset and a nonmarital asset." The court also noted that, if a modification needed to be made, a motion could be filed. Finally, the court addressed attorney fees and costs, noting that, on October 7, 2022, Lynn petitioned for contribution to attorney fees and that the petition was set for final hearing on November 1, 2023. The court ordered the parties to exchange account statements to facilitate the division of their accounts.

¶ 29                                    C. Attorney Fees

¶ 30   On the same date, the court held an evidentiary hearing on Lynn's petition for contribution to attorney fees. John testified that he was the primary wage earner during the parties' 35-year

marriage. His gross income was $298,577 in 2020, $297,424 in 2021, and $302,066 in 2022. John lives alone in Deer Park in a two-bedroom, two-bath apartment. On his September 5, 2023, financial affidavit, he listed his monthly gross income at $18,125, which equals $217,500 per year; he did not list a bonus because it is not guaranteed and "it could be zero." (Unlike in the past, there has been no guidance from management this year as to whether there will be a bonus.) In each of the prior three years, he received a bonus of about $80,000. In the affidavit, John listed paying $5800 per month in maintenance, whereas he pays $5700 per month; John testified this was a typographical error. John listed the following additional monthly expenses: $2771 in living expenses; $296 for the Disney timeshare and storage unit (which is possibly double counted and may be included in household expenses); $833 in legal fees (but testified he pays more than that and paid $5000 in monthly legal fees in 2022); $750 in groceries; $5675 in household expenses; $800 on entertainment expenses; $250 on vacation expenses; and $154 in long-term disability insurance. Thus, John's total monthly living expenses total either $8771 or $8475 (the latter of which equals $101,700 per year). He testified that he uses his remaining income for debt service, which is about $2723 per month (or $32,676 per year). John further testified that his 401(k) plan account has a balance of $44,723 (as of June 30, 2023), and his Vanguard IRA has a value of $2812 (as of August 31, 2023).

¶ 31    John further testified that he paid his former attorney (Weis Kunz) $70,000 in fees. He paid $24,500 to his former attorney Evan Mammas, and $13,000 to his current attorney. He is not of an age where he can access his retirement accounts and can only take a withdrawal from one account. When asked about his $80,000 bonus that he received in early 2023, John testified that he spent it all on attorney fees. If the court ordered him to pay Lynn's fees, he has no ability to pay them. Per regulations affecting his employment, he cannot default or claim bankruptcy; if he

does, he is subject to dismissal. Every year, he is allowed to take (and does take) a $20,000 draw against his bonus.

¶ 32    Lynn testified that she paid her current attorney about $85,000 (paid from interim fees, maintenance, and her $20,000 premarital distribution). She still owed about $70,000 to $75,000 in fees. Lynn is unemployed, lives with her father, is in poor health, and has no job training. Lynn does not pay rent to her father and does not believe she can live on her own. She has about $2300 in her bank account, and her only income is the $5700 in monthly maintenance from John. Most of her expenses, she testified, are paid by her father. Lynn pays $120 per month for a phone, $870 in monthly household expenses, $1105 in transportation expenses, and $752 for a car payment. Personal expenses equal $2300 per month. Lynn has a Morgan Stanley (formerly Vanguard) 401(k) plan that has about $18,649 in assets, but she cannot draw from it and a portion will go to John. John has a retirement account through his employer with $45,000 in assets, but Lynn is not able to draw from it.

¶ 33    Lynn completed a financial affidavit with estimated living expenses in May 2022. Rent for an apartment in Florida where she lives would cost $1800 for a one-bedroom unit and $2400 for a two-bedroom unit. Monthly living expenses would be $3421, and health insurance would be $1670. She bought a new 2022 Ford Bronco for $33,000. She paid her first attorney (David Kerpel) $10,000. Lynn testified that she does not have the means to pay her outstanding attorney fees or the ability to earn any income. She is asking John to contribute $75,000 to her outstanding attorney fees.

¶ 34    Lynn further testified that, during the marriage, she lived in a four-bedroom house with a pool, went out to dinner, and traveled frequently.

¶ 35    Lynn's attorney asserted that Lynn's outstanding balance with her is $68,176. She testified that she has practiced law for over 30 years and charges $375 per hour. Lynn paid her $85,000 to date.

¶ 36    The trial court found that the attorney fees were reasonable and necessary and entered a judgment in the amount of $35,000 against John. It noted that Lynn received $5700 in monthly maintenance, had a car payment of $752 per month, and spent $200 per month on grooming, reflecting "some liquid money available to pay expenses." The court also noted that John spent $800 per month on dining and entertainment, $250 for vacations, $100 for grooming, and $2771 for rent. He also deposited funds in his bank accounts. Thus, "[b]oth parties have some money to spend." John appeals.

¶ 37                                  II. ANALYSIS

¶ 38    John argues that the trial court erred in enforcing the memorandum of understanding (specifically, denying John's motion to vacate, granting Lynn's motion to compel, and denying John's motion to reconsider), where (1) it lacked definite and certain terms to be an enforceable agreement; (2) he had grounds to rescind the agreement, where the court liquidated the trust account and changed the terms by making it impossible for him to be awarded the funds; (3) it was unconscionable, given the conditions under which it was made and the fact that it is one-sided; and (4) the attorney fee contribution award is thereby erroneous or, alternatively, the court erred in awarding Lynn $35,000 in fees because she has an ability to pay and John does not. For the following reasons, we reject John's arguments.

¶ 39    As a preliminary matter, we note that Lynn did not file a brief in this appeal. We will nevertheless address the merits of the appeal under the principles set forth in *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976). Pursuant to *Talandis*,

in the absence of an appellee's brief, a reviewing court should address an appeal on the merits where the record is simple and where the claimed errors are such that the court may easily decide the issues raised by the appellant. *In re Marriage of Earlywine*, 2013 IL 114779, ¶ 13.

¶ 40                                    1. Enforceability

¶ 41    Turning to the merits, John argues first that the memorandum of understanding is an unenforceable contract because it lacks definite and certain terms required for the formation of a contract. First, he contends, it does not define the duration of the maintenance obligation (he believes the obligation is reviewable when he reaches social security retirement age, denies the trial court told him it is permanent, and Lynn believes it is permanent). Second, it does not state on what basis maintenance was calculated, asserting that this is an essential term for nonguideline maintenance awards. 750 ILCS 5/504(b-2)(2) (West 2022). On this point, John asserts that the $5700 maintenance award is an upward deviation from the statutory guidelines ($302,000 gross income for John and zero for Lynn, yields $5488 per month, he asserts, under the guidelines). Third, John argues that the memorandum lacks a duration for his obligation to pay Lynn's health insurance premiums (he believes it is short term until she is eligible for Medicare, and Lynn disagrees). Fourth, John asserts the memorandum is incomplete and uncertain as to the division of assets. Assuming the 80/20 split is in Lynn's favor, the agreement, he notes, does not state which assets are marital and which are nonmarital, the valuation date, and who is responsible for any tax consequences and transfer fees. Fifth, John argues that the memorandum does not include a date by which he needs to use his awarded Disney points and that the court ultimately supplied a date that is unrealistic. Finally, John asserts that the memorandum allocated 90% of the debt to him but does not state what the debts are or how the allocation will be accomplished. Because the

memorandum does not contain several essential terms, he argues, it does not rise to the level of an enforceable contract.

¶ 42    It is well settled that Illinois law favors the amicable settlement of property rights in cases of marital dissolution. *In re Marriage of Lorton*, 203 Ill. App. 3d 823, 825 (1990). To promote the amicable settlement of disputes between parties in a divorce action, the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101 *et seq.* (West 2022)) provides that parties may enter into an agreement containing provisions for disposition of their property, maintenance, support, and parental responsibility allocation. *Id.* § 502(a). The terms of the settlement agreement, except for those providing for support and parental responsibility allocation, are binding on the court, unless it finds, after considering the economic circumstances of the parties and any other relevant evidence produced by the parties, that the agreement is unconscionable. *Id.* § 502(b). Thus, settlement agreements are binding absent a finding of unconscionability. *In re Marriage of Wig*, 2020 IL App (2d) 190929, ¶ 19. "If the parties decide to settle their property rights by mutual agreement rather than by statute, they are bound to the terms of their agreement." *In re Marriage of McLauchlan*, 2012 IL App (1st) 102114, ¶ 21.

¶ 43    The terms of the settlement agreement are subject to the rules of construction for contracts, and the burden rests on the party asserting the agreement to establish its existence by clear and convincing evidence. *Lorton*, 203 Ill. App. 3d at 826; *In re Marriage of Doermer*, 2011 IL App (1st) 101567, ¶ 27. For the agreement to be enforceable, the material terms must be definite and certain, so that the trial court can determine from the terms and provisions, under the rules of construction and applicable principles of equity, what the parties have agreed to do. *In re Marriage of Haller*, 2012 IL App (5th) 110478, ¶ 26. Property settlement agreements, which have been assented to by both parties, may not be cancelled solely because one party withdraws his or her

assent prior to the entry of the judgment; a settlement agreement should not be disregarded simply because one party has second thoughts. *Id.* ¶ 44. Where the contents of the agreement are testified to and the objecting party fails to object or to give evidence to the contrary, the agreement is established. *Id.*

¶ 44 The determination of whether a valid settlement agreement occurred is in the discretion of the trial court, and its decision will not be reversed unless the court's determination is against the manifest weight of the evidence. *In re Marriage of Baecker*, 2012 IL App (3d) 110660, ¶ 25. The interpretation of a marital settlement agreement is a question of law. *In re Estate of Braun*, 222 Ill. App. 3d 178, 184 (1991).

¶ 45 We reject John's arguments. The parties negotiated the memorandum of understanding, they were represented by counsel during the negotiations, and they both signed the memorandum. The memorandum provides that John will pay Lynn $5700 in monthly maintenance. In the absence of a term, we construe it to be indefinite. The Act permits maintenance awards for an indefinite term (750 ILCS 5/504(b-1)(1)(B), (2), 504(b-2)(3) (West 2022)), and such awards are often granted in marriages, such as here, of long duration and disparate earning potentials (*In re Marriage of Culp*, 341 Ill. App. 3d 390, 398 (2003)). Further, John's arguments concerning deviation from statutory guideline maintenance are unavailing because the parties contracted for a specific maintenance amount; the court did not set maintenance.

¶ 46 Similarly, John's agreement to pay up to $850 per month toward Lynn's health insurance contains no time limit and makes no reference to a Medicare-triggered termination date. Thus, the only reasonable interpretation is that his obligation is indefinite. Again, the parties chose to forego having the trial court resolve this issue, contracted for this, and were represented by counsel. Furthermore, we note that John first raised this argument in his December 15, 2022, motion to

vacate the memorandum of understanding, asserting that the Medicare-triggered termination date was memorialized in his and Lynn's settlement letters; however, those letters are not contained in the record on appeal. Nor does the record contain a transcript from the hearing where the court heard argument on, and rejected, John's motion to vacate. Accordingly, we resolve any doubts that arise from the incompleteness of the record against John. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984).

¶ 47 As to John's arguments that the memorandum does not specify which assets are marital and which are non-marital and that the marital debts are not specified or allocated, we find them forfeited because they are undeveloped. He does not specify the assets, if any, over which the parties disagree as to their categorization. *In re Marriage of Heinrich*, 2014 IL App (2d) 121333, ¶ 44. Finally, as to John's argument concerning the Disney points, we find it forfeited because it, too, is undeveloped. *Id.*

¶ 48                                     2. Recission

¶ 49 Next, John argues that, even if the memorandum of understanding does not lack definite and certain terms, it was "within his rights to rescind his agreement to the document" when the trial court, on March 22, 2023, liquidated the funds in the trust account. He notes that the memorandum of understanding awarded him $3500 from the remaining home proceeds held in trust, but the trial court, he asserts, changed the terms of the agreement when it liquidated the trust account and awarded the funds to Lynn. This was impermissible, he asserts, and created an impossibility of performance. Thus, John argues, the trial court abused its discretion by not permitting him to abandon the memorandum of understanding. He requests that we vacate the memorandum and the portion of the dissolution judgment based on it.

¶ 50    " 'Rescission is the cancelling of a contract so as to restore the parties to their initial status.' " *Illinois State Bar Ass'n Mutual Insurance Co. v. Coregis Insurance Co.*, 355 Ill. App. 3d 156, 165 (2004).  A reviewing court will not disturb the trial court's decision granting or denying rescission unless it clearly resulted from an abuse of discretion. *Klucznik v. Nikitopoulos*, 152 Ill. App. 3d 323, 327 (1987).

> " 'The doctrine of legal impossibility, or impossible performance, excuses performance of a contract only when performance is rendered objectively impossible either because the subject matter is destroyed or by operation of law.'  *Innovative Modular Solutions v. Hazel Crest School District 152.5*, 2012 IL 112052, ¶ 37.  Performance can be made impossible by judicial action.  *Felbinger & Co. v. Traiforos*, 76 Ill. App. 3d 725, 733 (1979).  Impossibility of performance is an affirmative defense to a breach of contract claim and grounds to rescind or abandon a contract.  *YPI 180 N. LaSalle Owner, LLC v. 180 N. LaSalle II, LLC*, 403 Ill. App. 3d 1, 2-3 (2010).  The doctrine is narrowly applied based on 'judicial recognition that the purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances.'  *Rosenberger v. United Community Bancshares, Inc.*, 2017 IL App (1st) 161102, ¶ 24.  The party advancing the doctrine has the burden of proving impossibility. *Id.*" *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2021 IL App (1st) 200753, ¶ 87.

¶ 51    John argues that it would be unfair to hold him to the burdensome obligations in the memorandum of understanding, such as paying maintenance and a health insurance contribution and relinquishing 80% of the marital assets while bearing 90% of the debt, but to then take away one of the few benefits he received.  He contends that he should have been allowed to abandon the

agreement once the court changed the terms and rendered performance impossible by awarding Lynn the funds he was supposed to be awarded.

¶ 52 We reject John's argument. On March 22, 2023, the court held a hearing on Lynn's petition for interim and prospective fees. At the conclusion of the hearing, for which no transcript is contained in the record on appeal, the court awarded Lynn $10,000 in attorney fees contribution, of which $6407.32 would be paid from the trust account and tendered to her attorney. John apparently did not raise his present argument until September 22, 2023, in his motion to reconsider. We disagree with him that the agreement should be rescinded due to impossibility of performance. To the extent he is owed any monies, they *can* be paid or credited from other sources. Accordingly, as he failed to establish impossibility, there is no basis for rescinding the memorandum of understanding.

¶ 53                                    3. Unconscionability

¶ 54 Next, John argues that the memorandum of understanding is substantively and procedurally unconscionable. He contends that it is substantively unconscionable because it is one-sided. Specifically, John complains that it strips him of nearly everything he earned over the course of the parties' marriage. He received, he notes, only 20% of the assets, was assigned 90% of the debt, and must pay Lynn well over guideline support. Meanwhile, he asserts, Lynn was awarded 80% of the assets and assigned only 10% of the debt. John asserts that he is left with $5692.30 per month to pay for rent, food, and other fixed expenses that he claims total up to $5379 per month. This leaves him, he contends, with a few hundred dollars for automobile expenses, gas, insurance, health care, and other expenses. Addressing procedural unconscionability, John argues that the trial court twice noted that John would not like the consequences if he did not agree to the memorandum of understanding.

¶ 55   A settlement agreement will only be set aside if procured by fraud or coercion or if contrary to any rule of law, public policy, or morals. *Lorton*, 203 Ill. App. 3d at 825. The party asserting duress or coercion must prove the allegation by clear and convincing evidence. *In re Marriage of Smith*, 164 Ill. App. 3d 1011, 1017 (1987); *In re Marriage of Hamm-Smith*, 261 Ill. App. 3d 209, 215 (1994). When determining whether the agreement was unconscionable, the trial court assesses the facts existing immediately after the agreement is made. *In re Marriage of Wig*, 2020 IL App (2d) 190929, ¶ 19. A settlement agreement is unconscionable where there is an absence of meaningful choice on the part of one of the parties combined with contract terms that are unreasonably favorable to the other party. *In re Marriage of Baecker*, 2012 IL App (3d) 110660, ¶ 41. To determine whether an agreement is unconscionable, the court must consider (1) the conditions under which the agreement was made and (2) the economic circumstances of the parties that result from the agreement. *Wig*, 2020 IL App (2d) 190929, ¶ 19. Duress can make a settlement agreement between spouses unconscionable. *Baecker*, 2012 IL App (3d) 110660, ¶ 41.

¶ 56   On October 2, 2023, John testified, over counsel's objection, that the trial court (Judge Slavin) twice made the statement about signing the memorandum and that this was the reason he signed the agreement. He argues here that Lynn never testified that the statement was not made, her attorney argued it was not admissible because it was made in the settlement conference (not that it was untrue), and Lynn's attorney never cross-examined John on this point. John argues that the comments were made on the day trial was to begin and after a six-to-seven hour conference. Thus, his stress level would have heightened to a level where he felt deprived of a meaningful choice, and an objective person in this scenario would assume the court intended to impose a trial tax if he did not agree to the proposed settlement.

¶ 57     We reject this argument. The trial court found incredible John's testimony that Judge Slavin pressured the parties. We cannot conclude, without more, that this determination was unreasonable. *In re Marriage of Walker*, 386 Ill. App. 3d 1034, 1042 (2008) ("A reviewing court will defer to a trial court's determination of credibility because the trial court is in the best position to observe the conduct and demeanor of witnesses."). In any event, even if John's assertion was credible, his argument that the court's comment coerced him into signing the agreement still fails. During the negotiations, John was represented by counsel and signed the memorandum. To suggest, without more evidence, that he felt had no option when counsel was present to advocate for his interests is not well taken.

¶ 58                                  4. Attorney Fees

¶ 59     John's final argument is that, if we conclude that the memorandum of understanding is unenforceable, the attorney fee award should be vacated on the same basis and, alternatively, notwithstanding the enforceability of the memorandum, the trial court abused its discretion in awarding Lynn $35,000 in attorney fees.

¶ 60     We review a trial court's decision to award attorney fees for an abuse of discretion. *In re Marriage of Heindl*, 2014 IL App (2d) 130198, ¶ 28. A trial court abuses its discretion only where its ruling is unreasonable. *In re Marriage of Iqbal & Khan*, 2014 IL App (2d) 131306, ¶ 44.

¶ 61     "[A]n award of contribution is appropriate when the petitioning party is unable to pay his or her attorney fees and the other party has an ability to do so." *In re Marriage of Heroy*, 2017 IL 120205, ¶ 5. The court should "apply a list of factors to determine whether one party should be required to contribute to the attorney fees of the other, including the criteria used to divide marital property and award maintenance." *Id.* Section 508 of the Act states that "[t]he court *** after due notice and hearing, and after considering the financial resources of the parties, may order any party

to pay a reasonable amount for his [or her] own or the other party's costs and attorney[ ] fees." 750 ILCS 5/508(a) (West 2022). It explains that "contribution to attorney[ ] fees and costs may be awarded from the opposing party in accordance with subsection (j) of Section 503 and in any other proceeding under this subsection." *Id.*

¶ 62    Subsection 503(j) of the Act states that "[a]ny award of contribution to one party from the other party shall be based on the criteria for division of marital property under this Section 503 and, if maintenance has been awarded, on the criteria for an award of maintenance under Section 504." *Id.* § 503(j)(2). The criteria for dividing marital property in subsection 503(d) include:

> "(1) each party's contribution to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property, including *** the contribution of a spouse as a homemaker or to the family unit ***;
>
> (2) the dissipation by each party of the marital property ***;
>
> (3) the value of the property assigned to each spouse;
>
> (4) the duration of the marriage;
>
> (5) the relevant economic circumstances of each spouse when the division of property is to become effective ***;
>
> (6) any obligations and rights arising from a prior marriage of either party;
>
> (7) any prenuptial or postnuptial agreement of the parties;
>
> (8) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;
>
> (9) the custodial provisions for any children;
>
> (10) whether the apportionment is in lieu of or in addition to maintenance;

(11) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and

(12) the tax consequences of the property division upon the respective economic circumstances of the parties." *Id.* § 503(d).

¶ 63    The criteria for an award of maintenance under subsection 504(a) include:

"(1) the income and property of each party ***;

(2) the needs of each party;

(3) the realistic present and future earning capacity of each party;

(4) any impairment to the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) any impairment to the realistic present and future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party *** to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income ***;

(11) the tax consequences of the property division upon the respective economic circumstances of the parties;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) and any other factor that the court expressly finds to be just and equitable." *Id.* § 504(a)(1)-(14).

¶ 64　John argues that Lynn did not establish that she has an inability to pay. He contends that Lynn has, as the court found, money to pay expenses. She also receives $5700 in monthly maintenance and few expenses. Next, John argues that Lynn did not establish that John has an ability to pay. He asserts that his income can only stretch so far, as he pays the following court-ordered obligations: maintenance, $850 toward Lynn's health insurance, $800 per month to the IRS, $2450 in other debt responsibility, and $972 per month for the dissipation settlement. After his payments, he contends, he is left with $5692 per month (less than Lynn's maintenance) to pay for his living expenses, including rent, food, and other expenses. John also contends that the parties incurred nearly equal amounts of attorney fees during the divorce proceedings, and it was unreasonable for the trial court to order him to pay $35,000 of Lynn's attorney fees, where he was burdened with court-ordered obligations, the debt, and was awarded no assets.

¶ 65　We conclude that the trial court did not abuse its discretion in awarding Lynn $35,000 in attorney fees. The evidence reflected that Lynn's only income (other than the contribution to her health insurance) is the $5700 in monthly maintenance she receives from John, and the assets she received consisted of portions of the retirement accounts (which have minimal assets). She was not employed during the marriage, has health issues, and, excluding the $35,000 attorney fee award, still owes her attorney over $30,000 in fees. John's gross income in 2022 was $302,000, he listed $18,125 in gross monthly income (not including his bonus), and, although he agreed in

the memorandum of understanding to be allocated 90% of the debt, he testified that he is able to make his debt service payments and has funds for personal expenses such as entertainment, vacation, etc. Based on the evidence, we cannot conclude that the trial court's determination was unreasonable.

¶ 66                                III. CONCLUSION

¶ 67    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 68    Affirmed.